801 So.2d 864 (2001)
KESHBRO, INC., etc., et al., Petitioners,
v.
CITY OF MIAMI, etc., et al., Respondents.
City of St. Petersburg, Petitioner,
v.
Joseph H. Kablinger, Respondent.
Nos. SC94058, SC95600.
Supreme Court of Florida.
July 12, 2001.
Rehearing Denied December 7, 2001.
*866 David Forestier, North Miami, FL, for Petitioners in No. SC94058.
Jose Fernandez, City of Miami Assistant Attorney, Miami, FL, and Paul B. Feltman of Sweetapple, Broeker & Varkas, Miami, FL, for Respondents in No. SC94058.
Harry Morrison, Jr., General Counsel, Florida League of Cities, Tallahassee, FL, Thomas A. Bustin, Assistant City Attorney, City of St. Petersburg, St. Petersburg, FL, and Robert H. Freilich and Stephen J. Moore of Freilich, Leitner & Carlisle, Kansas City, MO, for the Florida League of Cities, Inc., and the City of St. Petersburg, Amici Curiae in No. SC94058.
Michael S. Davis, City Attorney, and Thomas A. Bustin, Assistant City Attorney, St. Petersburg, FL, and Robert H. Freilich and Stephen J. Moore of Freilich, Leitner & Carlisle, Kansas City, MO, for Petitioner in No. SC95600.
Robert H. Willis, Jr., St. Peterburg, FL, and Alan E. DeSerio of Brigham Moore Gaylord Schuster Merlin & Tobin, LLP, Tampa, FL, for Respondent in No. SC95600.
Herbert W.A. Thiele, County Attorney, Leon County, and Celeste F. Adorno, Assistant County Attorney, Tallahassee, FL, for Florida Association of Counties, Amicus Curiae.
Robert A. Butterworth, Attorney General, and Amelia L. Beisner, Assistant Attorney General, Tallahassee, FL, for The State of Florida, Amicus Curiae in No. SC95600.
Paul B. Feltman of Sweetapple, Broeker & Varkas, Miami, FL, for the City of Miami, Florida and the City of Miami Nuisance Abatement Board, Amici Curiae in No. SC95600.
George L. Dorsett, Assistant County Attorney, Orange County, Orlando, FL, for Orange County and Florida Association of County Attorneys, Amici Curiae in No. SC95600.
SHAW, J.
We have for review City of Miami v. Keshbro, Inc., 717 So.2d 601 (Fla. 3d DCA 1998), which expressly and directly conflicts with the decision in City of St. Petersburg v. Bowen, 675 So.2d 626 (Fla. 2d DCA 1996). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We also have for review the decision in City of St. Petersburg v. Kablinger, 730 So.2d 409 (Fla. 2d DCA 1999), which certified conflict with the decision in City of Miami v. Keshbro, Inc., 717 So.2d 601 (Fla. 3d DCA 1998). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We have consolidated these cases for review.
The question posed by these cases is whether temporary closures ordered by nuisance abatement boards to abate public nuisances as defined by section 893.138(1), Florida Statutes (1995), and the corresponding city code provisions constitute compensable takings.[1] Before addressing *867 that question, we must determine the takings analysis appropriate to these facts.[2]

City of Miami v. Keshbro
Petitioner, Harish Gihwala, has owned and operated the Stardust Motel, a fiftyseven-unit building located at 6730 Biscayne Boulevard, Miami, Florida, since 1988. On October 16, 1992, the City of Miami Nuisance Abatement Board (NAB) ordered the Stardust closed for one year as a drug- and prostitution-related public nuisance in violation of sections 46-1(a) and (c) of the City of Miami Code and section 893.13(1), Florida Statutes (1991).[3] Thereafter, the Stardust reopened in 1993; however, the problems soon resurfaced.
On December 10, 1996, the NAB served Gihwala with a notice of hearing again charging the Stardust as a drug-and prostitution-related public nuisance. The notice cited at least eight arrests involving drug and prostitution activity within the Stardust and its curtilage in the preceding six months. Gihwala then entered into a stipulation with the NAB pleading no contest to a finding that the Stardust constituted a public nuisance and agreeing to a partial closure of the Stardust.[4] Four months later, on March 4, 1997, following a status report hearing, the NAB ordered the closure of seven additional rooms for six months based on additional incidents of drug-and-prostitution-related nuisance activity.[5]
*868 Finally, on June 30, 1997, the NAB, after hearing additional evidence of nuisance activity including three arrests involving the sale of cocaine, ordered the complete closure of the Stardust for six months. The order provided as follows:
Ordered and Adjudged that the Stardust Motel is in violation of this Board's Order declaring public nuisance and further that the Stardust Motel shall be closed for the duration of this Board's jurisdiction, or until February 12, 1998. Respondents are ordered to remove all guests within five days of the date of this Order. The premises shall be secured within five days of the date of this order.
Gihwala responded by filing suit against the City of Miami and the NAB in Dade County Circuit Court for declaratory and injunctive relief and inverse condemnation, claiming that the NAB's complete closure of the Stardust for six months constituted a taking requiring compensation. The circuit court granted Gihwala's motion for summary judgment on the inverse condemnation claim and the city appealed.
On appeal, the Third District reversed the circuit court's grant of summary judgment under the authority of Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), finding that while the NAB's closure order denied Gihwala all economically beneficial uses of the Stardust, no compensation was required because the uses prohibited by the order, i.e., that of a "brothel and drug house," had no tradition of protection at common law nor did they inhere in the property rights of Gihwala at the time he acquired title. City of Miami v. Keshbro, Inc., 717 So.2d at 604-05. In so ruling, the Third District distinguished the Second District's decision in City of St. Petersburg v. Bowen by noting the extent to which the nuisance activity had become intertwined with the operation of the Stardust: "It is for this reason that we do not certify conflict with City of St. Petersburg v. Bowen; i.e., Bowen does not include any discussion of inextricable intertwining of proscribed uses with other, valid uses." Keshbro at 604 n. 8.
In Bowen, the Second District applied Lucas and found a compensable taking where the St. Petersburg NAB ordered an apartment complex closed for one year as a nuisance based on purported drug use by tenants. The Bowen court found the NAB's one-year closure of the apartment complex "one of the most invasive methods of abating the purported nuisance that was available." 675 So.2d at 629. The Second District further stated: "If the City of St. Petersburg wants to wage a war on drugs in part by means of this type of temporary taking then the City will be required to pay landowners just compensation." Id. at 632.

City of St. Petersburg v. Kablinger
On July 1, 1993, the City of St. Petersburg's NAB issued an order closing the property at issue here, an apartment complex then owned by Residential Property Management Inc., (RPM), based on at least two incidents involving the sale of cocaine within the preceding six months in violation of section 19-67 of the St. Petersburg Code of Ordinances.[6]
*869 In 1995, following corporate dissolution, RPM assigned its interest in the aforementioned property to Kablinger. Thereafter, Kablinger filed a complaint on June 17, 1997, against the City of St. Petersburg for inverse condemnation seeking compensation for the 1993 closure. The trial court granted Kablinger's motion for summary judgment as to the City's liability.
On appeal, the Second District affirmed the trial court's grant of summary judgment finding the case "materially indistinguishable" from its earlier decision in Bowen and certifying conflict with Keshbro. Kablinger, 730 So.2d at 410.

Lucas Analysis
In the instant cases both district courts, although reaching different conclusions regarding compensation, applied the takings analysis established in Lucas.[7] The Cities of Miami and St. Petersburg, as well as some of the amici curiae,[8] argue that the closures ordered by the respective NABs are not suitable for treatment under Lucas. Our review of Lucas and the cases proceeding it lead us to the opposite conclusion.
In Lucas, the Supreme Court acknowledged the recognition in its takings jurisprudence of at least two forms of regulatory action which require compensation without the usual case-specific inquiry into the public interest advanced in support of the restraint: (1) where the regulation compels the property owner to suffer a physical invasion, or (2) where the regulation "denies all economically beneficial or productive use of land." Lucas, 505 U.S. at 1015, 112 S.Ct. 2886. In the latter case, the State can resist compensation only if the regulation "proscribe[s] use interests [which] were not part of [the property owner's] title to begin with." Id. at 1027, 112 S.Ct. 2886.[9] Accordingly, a regulation *870 which amounts to a deprivation of all use "must ... do no more than duplicate the result that could have been achieved in the courts-by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." Id. at 1029, 112 S.Ct. 2886. This has been labeled the "nuisance exception."[10]
The property owner in Lucas purchased two residential beachfront lots intending to build single-family homes. Thereafter, South Carolina passed legislation effectively barring any residential development on Lucas's land. 505 U.S. at 1007, 112 S.Ct. 2886. Lucas brought suit in state court claiming that the legislation effected a taking requiring compensation. Id. at 1009. The trial court agreed, finding that Lucas's beachfront lots were rendered valueless by the legislation's ban on construction. The Supreme Court accepted the trial court's factual finding that Lucas's property was rendered valueless in concluding that South Carolina's action warranted treatment under the latter of the two categorical formulations as a deprivation of all economically beneficial or productive use. Consistent with that finding, the Court remanded the case so that the South Carolina courts could determine any "background principles of nuisance and property law" which would have prohibited Lucas's contemplated uses of the land, thereby absolving the state of its duty to compensate. Id. at 1031, 112 S.Ct. 2886.[11]
Whether that categorical analysis is appropriate here turns on whether the temporary closures ordered by the respective NAB's can be characterized as depriving Gihwala and Kablinger of "all economically beneficial or productive use" of their land. The cities argue that the very temporary nature of the closures precludes such a characterization.
Undoubtedly, as noted by the Supreme Court in Lucas, the application of Lucas's deprivation of all economically beneficial use standard is limited:
Justice Stevens criticizes the "deprivation of all economically beneficial use" as "wholly arbitrary," in that "[the] landowner whose property is diminished in value 95% recovers nothing," while the landowner who suffers a complete elimination of value "recovers the land's full value." This analysis errs in the assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation. Such an owner might not be able to claim the benefit of our categorical formulation, but as we have acknowledged time and again, "[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations" are keenly relevant to the takings analysis generally.
*871 Id. at 1019 n. 8, 112 S.Ct. 2886. Such a fatal blow to a property's economic value, argue the cities, cannot be struck by a temporary closure like that ordered here by the respective NABs. See, e.g., Florida Rock Industries, Inc. v. United States, 18 F.3d 1560, 1565 (Fed.Cir.1994) ("If, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's `categorical' taking rule.").
In the instant cases the courts determined that the temporary closures issued by the respective NABs could amount to a "deprivation of all economic use" as that phrase is used in Lucas, relying primarily on the Supreme Court's language in First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987): "`Temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." Indeed, this Court has relied on First English in stating that temporary deprivations can constitute takings: "A taking occurs where regulation denies substantially all economically beneficial or productive use of land. Moreover, a temporary deprivation may constitute a taking." Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corp., 640 So.2d 54, 58 (Fla.1994). However, the issue is not whether temporary deprivations can constitute takings; it is clear that such regulations can.[12] Instead, the question posed is whether regulations which temporarily deprive one of the use of property can qualify for categorical treatment under Lucas's deprivation of all economically beneficial or productive use standard.[13]
*872 In that vein, the cities counter that the First English court issued the aforementioned "temporary taking" language in deciding the narrow remedial issue before it, rather than holding that takings of a defined duration can qualify for categorical treatment under Lucas.
In First English, a church sought compensation for an alleged regulatory taking after the County of Los Angeles adopted an ordinance prohibiting the building or rebuilding on land owned by the church because of flood concerns.[14] The church alleged that the ordinance deprived it of all use of the affected property, requiring the county to provide just compensation. The California Court of Appeal rejected the church's claim under the authority of Agins v. City of Tiburon, 23 Cal.3d 605, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), aff'd, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). In Agins, the California Supreme Court held that "compensation is not required until the challenged regulation or ordinance has been held excessive in an action for declaratory relief or a writ of mandamus and the government has nevertheless decided to continue the regulation in effect." First English, 482 U.S. at 308-09, 107 S.Ct. 2378. The practical effect of the Agins rule was to hold that the "Fifth Amendment, as made applicable to the States through the Fourteenth Amendment, [did] not require compensation as a remedy for `temporary' regulatory takings those regulatory takings which are ultimately invalidated by the courts." Id. at 310, 107 S.Ct. 2378.
The Court was previously unable to review the Agins rule because of concerns with finality:
Concerns with finality left us unable to reach the remedial question in the earlier cases where we have been asked to consider the rule of Agins. In each of [those] cases, we concluded either that regulations considered to be in issue by the state court did not effect a taking, or that the factual disputes yet to be resolved by state authorities might still lead to the conclusion that no taking had occurred.
Id. at 311, 107 S.Ct. 2378 (citations omitted). The Court perceived no such barrier to an examination of the Agins rule in First English, given the California Court of Appeal's affirmance of the trial court's ruling that the church's claim that the ordinance denied it of all use of its property was irrelevant. Id. at 309, 107 S.Ct. 2378. Accordingly, the Court was finally confronted with the narrow question of remedies posed by the application of the Agins rule: "The disposition of the case on these grounds isolates the remedial question for our consideration." Id. at 311, 107 S.Ct. 2378.
Thus, the issue before the Court in First English was whether a landowner who claims his property has been taken by a land-use regulation can recover damages for the time prior to the time the regulation is determined to constitute a taking. Id. at 306-07, 107 S.Ct. 2378. The Court answered the question in the affirmative: "We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." Id. at 321, 107 S.Ct. 2378.
*873 In this context, it appears that the Court used the term "temporary taking" to refer to the period before a regulatory taking is invalidated by the courts: "Appellant asks us to hold that the California Supreme Court erred in Agins v. Tiburon in determining that the Fifth Amendment ... does not require compensation as a remedy for `temporary' regulatory takings those regulatory takings which are ultimately invalidated by the courts." Id. at 310, 107 S.Ct. 2378 (emphasis added). Accordingly, First English really involved a question of remedies, not a determination that temporary takings, as that term is used here, can constitute deprivations of all economically beneficial use. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency, 216 F.3d 764, 778 (9th Cir.2000) ("What is `temporary,' according to the [First English] Court's definition, is not the regulation; rather, what is `temporary' is the taking, which is rendered temporary only when an ordinance that effects a taking is struck down by a court."), cert. granted, ___ U.S. ___, 121 S.Ct. 2589, 150 L.Ed.2d 749, 69 U.S.L.W. 3799 (U.S. June 29, 2001); First English Evangelical Lutheran Church v. County of Los Angeles, 210 Cal.App.3d 1353, 258 Cal.Rptr. 893, 897 (1989) ("The United States Supreme Court in First English made it abundantly clear that the Court was deciding the remedies issue and only that issue."); Dwight H. Merriam, What is the Relevant Parcel in Takings Litigation?, SC43 ALI-ABA 505, 526 (1998) ("In First English the Supreme Court held that once a court concludes that a regulation goes too far and effects a taking, money damages are a constitutionally-required remedy.").[15]
Nevertheless, while we agree the Court's discussion of temporary takings in First English referred to retrospectively temporary takings, absolutely precluding prospectively temporary regulations from treatment under Lucas elevates form over substance and defies economic realities. See City of Seattle v. McCoy, 101 Wash. App. 815, 4 P.3d 159 (2000) (holding city's closure of a restaurant for one year under drug nuisance statute a total taking, concluding that the closure denied the property owners of all economically viable use under Lucas); State ex rel. Pizza v. Rezcallah, 84 Ohio St.3d 116, 124, 702 N.E.2d 81 (1998) (holding the same as to one-year closures of property pursuant to nuisance abatement statutes, noting that "[t]he fact that the order is of limited duration does not change this conclusion"). To allow such a fine distinction to guide the takings inquiry would ignore the drastic economic impacts inflicted by such regulations, rendering the protections offered by the categorical rule meaningless. Cf. Lucas, 505 U.S. at 1025 n. 12, 112 S.Ct. 2886 (criticizing the vagaries of the harmprevention logic which previously dominated the Court's takings inquiry as allowing the government to escape the requirement of compensation where the legislature had artfully crafted the subject regulation).[16] *874 In sum, we are unable to discern any meaningful distinction justifying the preclusion of prospectively temporary regulations from categorical treatment under Lucas. Moreover, we believe this to be the only logical outgrowth of First English. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency, 34 F.Supp.2d 1226, 1250 (D.Nev.1999) ("Since the [First English] Court ... [found] that `retrospectively' temporary regulatory takings should be compensated, it is hard to see that it would reach a different conclusion when faced with a `prospectively' temporary regulatory taking."), aff'd in part, reversed in part, 216 F.3d 764 (9th Cir. 2000).[17]
Moreover, the courts refusing to extend First English beyond its remedial genesis to prospectively temporary regulations have done so in the land use and planning arena, where an entirely different set of considerations are implicated from those in the context of nuisance abatement where a landowner is being deprived of a property's dedicated use. The concerns specific to the regulation of land use and planning were noted by the Ninth Circuit in declining to apply Lucas's categorical takings analysis to the temporary takings claims of landowners in the Lake Tahoe region with regard to a temporary moratorium on development instituted in an effort to stem the environmental degradation of Lake Tahoe:
[T]he widespread invalidation of temporary planning moratoria would deprive state and local governments of an important land-use planning tool with a well-established tradition. Land-use planning is necessarily a complex, timeconsuming undertaking for a community, especially in a situation as unique as this. In several ways, temporary development moratoria promote effective planning. First, by preserving the status quo during the planning process, temporary moratoria ensure that a community's problems are not exacerbated during the time it takes to formulate a regulatory scheme. Relatedly, temporary development moratoria prevent developers and landowners from racing to carry out development that is destructive of the community's interests before a new plan goes into effect. Such a race-to-development would permit property owners to evade the landuse plan and undermine its goals. Finally, the breathing room provided by temporary moratoria helps ensure that the planning process is responsive to the property owners and citizens who will be affected by the resulting landuse regulations.
*875 Tahoe-Sierra Preservation Council, 216 F.3d at 777 (citations and footnote omitted).

Other Available Uses
In addition to the claims regarding the closures' defined duration, the cities contend that the property owners were not deprived all economically beneficial or productive uses of the property because they had other uses available to them under the terms of the closure orders. We disagree. The orders closing the properties in question rendered the properties economically idle, which impact is all the more onerous with regards to property that has already been dedicated to a particular use:
Owner Gihwala and his family reside on the premises, in four of the rooms. The City's suggestion that this alone is an economically viable use of a 57-unit motel defies the logic of finance. The City's further suggestion that the zoning code allows some 60 uses other than as a motel ignores the fact that the structure on the property was designed and built as a motel. Transforming it into some other use (a shopping mall? a gasoline station?) for the six-month-closure period lacks any basis in reason.
Keshbro, 717 So.2d at 604 n. 7.[18]
Our conclusion that the closure orders issued by the respective NABs deprived Gihwala and Kablinger of all economically beneficial or productive use of their properties does not end our inquiry. Under Lucas, the cities can resist compensation only if they can identify "background principles of nuisance and property law that the prohibit the uses" proscribed by the orders. Lucas, 505 U.S. at 1031, 112 S.Ct. 2886. A regulation so restricting the use of property can "do no more than duplicate the result that could have been achieved in the courtsby adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." Id. at 1029, 112 S.Ct. 2886.
The difficulty posed by the action of the NABs emanates from the breadth of the respective orders closing the subject properties. The orders proscribed all uses of the respective properties, both legal and illegal. Cf. Bowen, 675 So.2d at 631 (emphasizing that the NAB's closure order of the apartment complex proscribed all uses of the property, leaving no uses available).[19] Under Lucas, our inquiry must therefore focus on whether the closure orders mirror the relief which "could have been achieved in the courtsby adjacent *876 landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." Lucas, 505 U.S. at 1029, 112 S.Ct. 2886.
It is well settled in this State that injunctions issued to abate public nuisances must be specifically tailored to abate the objectionable conduct, without unnecessarily infringing upon the conduct of a lawful enterprise. See, e.g., Brower v. Hubbard, 643 So.2d 28, 30 (Fla. 4th DCA 1994) ("Injunctions must be specifically tailored to each case; they should not infringe upon conduct that does not produce the harm sought to be avoided"); 4245 Corp. v. City of Oakland Park, 473 So.2d 12, 13 (Fla. 4th DCA 1985) ("The injunction totally putting the corporation out of business was too drastic and its terms overbroad. The trial court should have limited the injunction to the illegal acts of lewdness and given the corporation an opportunity to function as a legitimate enterprise"); Health Clubs, Inc. v. State ex rel. Eagan, 377 So.2d 28, 29-30 (Fla. 5th DCA 1979) ("Where illegal conduct which has been decreed to constitute a public nuisance is separable from legal conduct within a business enterprise, only the illegal conduct may be enjoined.").
In the case of the Stardust, however, the Third District concluded that the operation of the Stardust had become inextricably intertwined with the drug and prostitution activity sought to be enjoined:
[T]he record reflects that the motel was, in reality, not a motel, but rather a brothel and drug house which the owners, for whatever reason, failed to stop operating on their property. The record shows that the prostitution and drugrelated activities were inextricably intertwined with the motel. In order to preclude these proscribed activities, it was necessary to bar access to the base of operations, which, the Board concluded, could only be done by completely closing the Stardust Motel.
Keshbro, 717 So.2d at 604 (footnote omitted). We agree. The record demonstrates that the City of Miami NAB acted patiently in attempting to eradicate the drug and prostitution problem at the Stardust. Their efforts, however, met with failure. As emphasized by the Third District, the drug and prostitution activity had become part and parcel of the operation of the Stardust. On this record of extensive and persistent drug and nuisance activity which had become inextricably intertwined with the Stardust's operation, we conclude that the City of Miami's NAB acted reasonably in ordering the temporary closure of the Stardust.[20]
The same, however, cannot be said of the NAB's action in Kablinger. No *877 similar record of persistent drug activity precipitated the apartment's closure; rather, the St. Petersburg NAB closed the apartment complex solely on a finding that the apartment had been the site of cocaine sales on more than two occasions. Unlike the Stardust, there was no extensive record indicating that the drug activity had become an inseparable part of the operation of the apartment complex. Absent such a record, we are unable to conclude that the NAB's action in closing Kablinger's apartment complex for one year was specifically tailored to abate the drug nuisance found to exist at the property.
Based on the foregoing, we approve the decisions reached in Keshbro and Kablinger.
It is so ordered.
WELLS, C.J., and HARDING, ANSTEAD, PARIENTE, and LEWIS, JJ., concur. QUINCE, J., recused.
NOTES
[1] Section 893.138(2), Florida Statutes (1995), provides the authority for municipalities and counties to create nuisance abatement boards:

Any county or municipality may, by ordinance, create an administrative board to hear complaints regarding the nuisances described in subsection (1).
The nuisances proscribed in subsection (1) include prostitution and drug-related activity.
[2] Both Keshbro and Kablinger raise claims collateral to the conflict issue before this Court, which were not addressed by the respective district courts of appeal. We decline to address those claims. See, e.g., Crosby v. Jones, 705 So.2d 1356, 1359, n. 1 (Fla. 1998). Specifically, both Keshbro and the City of St. Petersburg raise issues regarding the propriety of the trial courts' orders granting summary judgment. Additionally, Keshbro argues that the Third District impermissibly relied on extraneous evidence in determining that the nuisance activity was inextricably intertwined with the operation of the Stardust Motel.
[3] Section 46-1(a) of the City of Miami Code provides:

Any building, place or premises located in the city which has been used on three or more occasions, documented by substantiated incidences, as the site of the unlawful sale or delivery of controlled substances, or for any act as defined in F.S. ch. 893, and where there has been at least one criminal conviction for the acts defined in F.S. ch. 893, within a six-month period from the date of the first substantiated incident, at the same location, is hereby declared to be an unlawful public nuisance. In the absence of a certified conviction at the premises, the allegations of F.S. ch. 893 related to public nuisance must be substantiated by seven documented instances within a six-month period from the date of the first documented instance in order to support a finding of public nuisance at the premises.
Section 46-1(c) provides the same with regards to prostitution activity.
[4] The NAB order embodying the stipulation attributed no criminal wrongdoing to Gihwala: "The City of Miami does not assert or imply that the owner, personally, is party to any drug sales or illegal activities." The partial closure plan called for the closure of six rooms for six months, during which time Gihwala was to refurbish said rooms. Thereafter, another six rooms would be closed for refurbishing, Gihwala's finances permitting. A total of fifteen rooms were to be closed and refurbished pursuant to the stipulation, with no more than six rooms being closed at any one time.
[5] The NAB heard evidence of an arrest for the sale of cocaine in two separate rooms at the Stardust and evidence that the property was "maintaining an atmosphere and reputation as a place of prostitution and drug sales."
[6] Section 19-67 of the St. Petersburg Code of Ordinances provides in pertinent part:

(d) The Nuisance Abatement Board shall hear complaints alleging that any place or premises constitutes a public nuisance, and may find said place or premises, or any part thereof, to be a public nuisance, upon clear and convincing and competent evidence that said place or premises:
(1) Has been used on one occasion as the site of the unlawful possession of a controlled substance, where such possession constitutes a felony and that has been previously used on more than one occasion, all within a 6-month period, as the site of the unlawful sale, delivery, manufacture, or cultivation of any controlled substance; or has been used on more than two occasions, all within a 6-month period:
(3) As the site of the unlawful sale, delivery, manufacture, or cultivation of any controlled substance.
[7] The Second District in Kablinger relied exclusively on Bowen in deciding the takings issue. In Bowen the Second District analyzed the takings issue under Lucas after concluding that the complete closure of an apartment complex for one year as a drug-related public nuisance deprived the owners of substantially all use of their property. Bowen, 675 So.2d at 629.
[8] Amicus briefs in support of the City of Miami were filed by the Florida League of Cities and the City of St. Petersburg. The City of Miami, Florida Association of Counties, Orange County, Florida Association of County Attorneys, and the State of Florida filed briefs in support of the City of St. Petersburg.
[9] The Lucas court explained its categorical treatment of regulations effecting the deprivation of all economically beneficial or productive use of property by stating:

We have never set forth the justification for this rule. Perhaps it is simply, as Justice Brennan suggested, that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. "[F]or what is the land but the profits thereof[?]" Surely, at least, in the extraordinary circumstance when no productive or economically beneficial use of land is permitted, it is less realistic to indulge our usual assumption that the legislature is simply "adjusting the benefits and burdens of economic life," in a manner that secures an "average reciprocity of advantage" to everyone concerned. And the functional basis for permitting the government, by regulation, to affect property values without compensation that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,"does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses.
Lucas, 505 U.S. at 1017-18 (citations omitted).
[10] Concisely stated, "[a] regulation eliminating the value of private property effects a taking unless the purpose of the regulation is to control a public nuisance." Stuart Miller, Triple Ways to Take: The Evolution and Meaning of the Supreme Court's Three Regulatory Taking Standards, 71 Temp. L.Rev. 243, 254 (1998).
[11] On remand the South Carolina Supreme Court found no common law basis or principle allowing the state to prohibit Lucas's construction of residential property on the land. Lucas v. South Carolina Coastal Council, 309 S.C. 424, 424 S.E.2d 484 (1992). Accordingly, the court remanded the case to the trial court so that it could determine the actual damages sustained by Lucas as a result of the temporary deprivation of the use of his property. Id.
[12] Those regulations which fall short of effecting a categorical taking are appropriately analyzed under the ad-hoc factual inquiry outlined in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). See, e.g., Florida Rock Indus., Inc. v. United States, 18 F.3d 1560 (Fed.Cir.1994); Zeman v. City of Minneapolis, 552 N.W.2d 548 (Minn.1996); Woodbury Place Partners v. City of Woodbury, 492 N.W.2d 258, 261 (Minn.Ct.App.1992). The Penn Central analysis is an ad-hoc factual inquiry requiring the examination of several factors in the consideration of a takings claim; keenly relevant in that analysis is "[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations." Lucas, 505 U.S. at 1019 n. 8, 112 S.Ct. 2886 (quoting Penn Central, 438 U.S. at 124, 98 S.Ct. 2646).
[13] In Bowen the Second District stated:

Based upon the A.G.W.S. case and the Joint Ventures case, as well as numerous United States Supreme Court cases, if the closure of the Lorraine Apartments by the nuisance abatement board resulted in depriving the owner of all economic use of the property, even if this deprivation was temporary, then as a matter of law there is deemed to have been a taking and the property owner is entitled to be compensated for the economic loss suffered.
675 So.2d at 629 (emphasis added). While we have previously indicated that temporary deprivations can constitute a taking, we have not addressed whether regulations designed by their enactors to be temporary, i.e., prospectively temporary regulations, are appropriately analyzed under Lucas's categorical rule. See Palm Beach County v. Wright, 641 So.2d 50 (Fla.1994) (rejecting claims by landowners that county thoroughfare maps forbidding any land use activity in an area designated for future roadway construction established a per se taking and was facially invalid); Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 640 So.2d 54 (Fla.1994) (reaffirming that Joint Ventures was decided on due process grounds in rejecting claims that Joint Ventures established a per se taking claim for landowners affected by the maps of reservation); Joint Ventures, Inc. v. Department of Transp., 563 So.2d 622 (Fla.1990) (holding statute allowing the Department of Transportation to file maps of reservation preventing an affected property owner from obtaining the necessary development permits for his property an impermissible exercise of the State's police power on due process grounds).
[14] The church maintained a retreat center for handicapped children and related structures on the affected land. Those structures were destroyed in the flood, which precipitated the county ordinance.
[15] See also Woodbury Place Partners v. City of Woodbury, 492 N.W.2d 258, 262 (Minn.Ct. App.1992) ("First English does not create a new liability standard to determine when a `temporary' taking occurs, but clarifies the appropriate remedy after a taking is recognized.... The apparent reach of First English is to retrospectively temporary takings (e.g., regulations subsequently rescinded or declared invalid), not prospectively temporary regulations...."); Frank Michelman, Takings, 1987, 88 Colum. L.Rev. 1600, 1621 (1988) ("On the interpretation suggested here, the First English decision does not reach regulatory enactments, even totally restrictive ones, that are expressly designed by their enacters to be temporary....").
[16] In Justice Blackmun's view, even with respect to regulations that deprive an owner of all developmental or economically beneficial land uses, the test for required compensation is whether the legislature has recited a harm-preventing justification for its action. Since such a justification can be formulated in practically every case, this amounts to a test of whether the legislature has a stupid staff. We think the Takings Clause requires courts to do more than insist upon artful harm-preventing characterizations.

Lucas, 505 U.S. at 1025 n. 12, 112 S.Ct. 2886 (citations omitted).
[17] See also G. Richard Hill, Foreword to Regulatory Taking: The Limits of Land Use Controls, at xxii (G. Richard Hill, ed.1990). Hill criticizes the Minnesota appellate court's decision in Woodbury, where the court declined to apply Lucas's categorical takings analysis to a two-year interim moratorium on development because of the regulation's defined duration:

In an impressive act of judicial legerdemain, the court distinguished Lucas because the Lucas taking was presumptively permanent, until such a time as the legislature amended the act to allow a special permit, transforming the taking to a temporary act. In Woodbury, the Minnesota court found that a two-year holding period was merely a delay and not a taking of all use. In terms of its impact on the property owner, however, it is certainly difficult to see the distinction between the two cases.
[18] The Second District in Bowen reached a similar conclusion:

There can really be no question that by virtue of its closing order, the Nuisance Abatement Board has deprived the Plaintiff of all economic use of this property. The property, a 15 unit apartment building, can be put to no other use during the close down period.
675 So.2d at 631; see also Lucas, 505 U.S. at 1009 n. 2, 112 S.Ct. 2886 (noting that South Carolina's Beachfront Management Act allowed "the construction of certain nonhabitable improvements, e.g., `wooden walkways no larger in width than six feet,' and `small wooden decks no larger than one hundred forty-four square feet.'").
[19] In this regard the Second District stated in Bowen:

In the present case, there is no common law nuisance being prevented by the closure. The prohibited activity was any use of the apartment building. The NAB order did not really proscribe any particular nuisance, such as would be done by enjoining the sale or use of drugs on the premises. Such an injunction would leave other legal uses available to the Plaintiff, but the order involved here left no use available.
675 So.2d at 631.
[20] With regard to the Third District's finding that the operation of the Stardust was inextricably intertwined with the drug and prostitution activity precipitating the NAB's action, Gihwala argues that he should not be punished as an innocent property owner for the criminal acts of third parties. While Gihwala's arguments are certainly compelling, neither Gihwala, nor Kablinger for that matter, have challenged the validity of these regulations on due process grounds as an invalid exercise of the State's police power. We are presented here solely with the remedial question of whether compensation is owed to Gihwala or Kablinger. Other jurisdictions, however, have addressed the constitutionality of similar regulations. See City of Minneapolis v. Fisher, 504 N.W.2d 520 (Minn.Ct.App.1993) (rejecting a facial and as applied constitutional attack of a one-year closure of a public sauna under nuisance abatement regulations for prostitution convictions of third parties); State ex rel. Pizza v. Rezcallah, 84 Ohio St.3d 116, 702 N.E.2d 81 (1998) (holding statute allowing the closure of property for one year upon proof of felony drug convictions on the premises unconstitutional as applied to property owners which neither acquiesced nor participated in the drug activities); City of Seattle v. McCoy, 101 Wash.App. 815, 4 P.3d 159 (2000) (holding drug nuisance abatement statutes calling for one-year closure of nuisance properties unconstitutional on takings and due process grounds as applied to restaurant owners which were not involved in the illegal activity and actively sought to prevent the drug activity on their property); City of Milwaukee v. Arrieh, 526 N.W.2d 279 (Wis.Ct. App.1994) (rejecting claim that a statute, providing for property closures on the basis of drug activity, was unconstitutional in that it punished innocent property owners).