804 So.2d 464 (2001)
BRADFORDVILLE PHIPPS LIMITED PARTNERSHIP, Appellant,
v.
LEON COUNTY, Florida, Appellee.
No. 1D01-541.
District Court of Appeal of Florida, First District.
November 26, 2001.
Rehearing Denied January 7, 2002.
*465 Carl R. Pennington, Jr., and John C. Pelham of Pennington, Moore, Wilkinson, Bell & Dunbar, P.A., Tallahassee, for Appellant.
Herbert W.A. Thiele, County Attorney, and Theresa R. Thompson, Assistant County Attorney, Tallahassee, and Robert H. Freilich, Kansas City, Missouri, for Appellee.
KAHN, J.
Appellant, Bradfordville Phipps Limited Partnership (Partnership), challenges an order rendered by the Second Judicial Circuit Court denying its motion for summary judgment and granting summary judgment in favor of Appellee, Leon County (County). The Partnership, which owns property in a part of Leon County known as the Bradfordville Study Area (BSA), had filed an inverse condemnation action against the County following the imposition of a temporary injunction that prohibited the County from issuing certain permits for development in the BSA. We affirm.

I.
The record reveals that effective December 3, 1998, the circuit court imposed an injunction in another proceeding, prohibiting the County "from issuing any future building permits or other development permits authorizing construction within the Bradfordville Study Area until such time as the County comes into compliance *466 with 8.1, 8.3, 8.3.1 and 8.5.2 of the Land Use Element of the Tallahassee/Leon County Comprehensive Plan." Land Use Goal 8 concerned the development and implementation of a comprehensive stormwater plan for the BSA. On January 12, 1999, the plaintiffs in the other proceeding and the County entered an interim settlement agreement, pursuant to which the County agreed not to appeal the injunction order. The next day, the court entered another order, amending the injunction order to exclude from its scope certain property and projects.
On April 5, 1999, the Partnership brought this action against the County. In the complaint, the Partnership alleged, among other things, that the County's actions "resulted in the [Partnership's] inability to move forward with the development and use of its property and has deprived the [Partnership] of all reasonable economic use of its property." The Partnership alleged that it "has expended substantial efforts and substantial sums of money and has incurred great expense in pursuing its plan of development" of the property. The Partnership further alleged that, in December 1998, it had submitted "a completed Environmental Permit application relating to the development of its project," but this application was rejected by the County due to the injunction. The Partnership alleged that this permit application was a prerequisite to the issuance of any building permit and "[t]he denial of the application for such permit prohibits [the Partnership] from proceeding with the development of its property." The complaint summarized the Partnership's basis for a claim of inverse condemnation:
The acts and omissions of the County as alleged herein, including: (a) agreeing to the entry of an Order enjoining the County from issuing any further permits for development; and (b) agreeing not to appeal any order which may be entered enjoining issuance of permits for the development of the subject property, constitute a substantial deprivation of the beneficial use of the Plaintiff's property rights and constitutes a taking of Plaintiffs property for a public purpose without payment or compensation.
On December 14, 1999, as part of its effort to comply with the injunction and the Comprehensive Plan, the County adopted Ordinance No. 99-31, an Interim Development Ordinance (IDO). Pursuant to the IDO, the County restricted the issuance of development permits for land in the BSA:
1. Development Permits. Notwithstanding any provision of the Land Development Regulations to the contrary, no development permit shall be issued and no Application For Land Use Approval shall be approved in the Bradfordville Study Area during the term of this Ordinance, except as provided in paragraph 4, below.
* * *
4. Type of Uses and Development Permits Affected. This Ordinance shall apply, as and to the extent set forth herein, to all applications for land use approval submitted after the Effective Date of this Ordinance not otherwise excepted by the Court Orders being the Injunction Order dated December 15, 1998, the Interim Settlement Agreement of January 12, 1999, and the modified Injunction Order dated January 13, 1999.
The IDO also listed several "Types of Uses and Development Permits Not Affected." The term of the IDO was limited to seven months, unless extended by a majority vote of the Board of County Commissioners.
*467 On July 11, 2000, the County adopted Ordinance No. 00-31. This ordinance implemented the provisions of Land Use Goal 8 of the Comprehensive Plan and evidently constituted the requisite action to comply with the court-ordered injunction. By order dated October 23, 2000, the circuit court dissolved the injunction.
On October 5, 2000, the Partnership and the County each filed motions for summary judgment. By an order rendered December 4, 2000, the circuit court granted the County's motion and denied the Partnership's motion, and entered final summary judgment in favor of the County. In the order, the trial judge found, "[W]hile I can understand the Plaintiff's frustrations with the financial burden imposed upon it by the actions and inactions of the County, I find that under the undisputed facts of this case, it does not amount to a `taking', entitling Plaintiff to the relief sought." In particular, the judge determined that "the facts show as a matter of law that the Plaintiff has not met [the] ripeness test." The court found that the Partnership "made no effort to intervene in the [other] suit ... and challenge the injunction, to seek to have itself excepted from its provisions, or to have it modified so as to allow acceptable economically viable uses." The court also made the following findings:
The Plaintiff says that the use of the property for residential development, in light of its location at the intersection of two major roads, and in light of the purchase price of the property and the cost of development, would not make sense financially. No one would buy residential lots in this location at the prices Plaintiff would have to charge in order to achieve any kind of return on its investment. I cannot disagree with the logic of that argument, but that is not the test. Unfortunately for the Plaintiff, the owner is not protected from regulations that reduce or eliminate the profit that might be realized from land so long as there is some use of the property that economically can be executed. And, as noted above, in addition to possible residential use, other property in the area had been exempted for use as a fire station, a church, and a school. In short, because the Plaintiff has not tested the regulation and gotten a final authoritative decision as to the extent of the regulation on the use of its property, the issue of a taking is not ripe for adjudication.
The court further found that, even assuming the Partnership had satisfied the ripeness test, "it still cannot establish, on the undisputed facts, that a taking has occurred by virtue of the injunction and the subsequent interim ordinance." In this regard, the court made the following findings:
The record evidence in this case shows that the Plaintiff knew or should have known that land development was highly restricted in Leon County. The various applications and reapplications and modifications by its engineer consultant in working through the myriad of regulations attest to this. The Plaintiff also knew or should have known that there was resistance to commercial or other intense development in the Bradfordville area because it had to negotiate with adjoining landowners in agreeing to limit the use of its property. With constructive notice of the existence of the comprehensive plan, and specifically Land Use Goal 8, it was not unreasonable to expect that there might be other and further restrictive regulations or court remedies imposed which would impact on Plaintiff's plans.
The court acknowledged case law cited by the Partnership indicating that a regulation *468 could constitute a temporary taking, but distinguished those cases from the one at hand. The court concluded that no taking had occurred in this case:
In summary, the Plaintiff purchased its property with actual or constructive notice of the highly restrictive land use environment that existed, and the specific regulations that might thwart or adversely affect its development plans. The court action and subsequent interim ordinance were not, then, reasonably unexpected. The restriction was temporary in nature. The Plaintiff did not obtain a final authoritative determination of the extent to which the regulation curtailed Plaintiff's use of its property. Given the temporary nature of the injunction and interim ordinance, it probably made economic sense to wait it out in hopes that the highest and best use, the most profitable use of the property might be realized after the injunction was lifted. The financial burden of that delay, however, is not, on the undisputed facts here, compensable.
The Partnership has appealed and raises several issues concerning the trial court's ripeness analysis and application of takings jurisprudence.

II.
It is not clear to us that an analysis of ripeness is necessary in this case, given the nature of the temporary regulatory taking claim brought by the Partnership. Where a self-limiting regulation imposes a mere delay on the landowner's use of the property, it makes little sense to require the landowner to immediately attempt some less economically valuable use of the land because the anticipated outcome is that the land will ultimately be useable in a variety of ways, as it was before the temporary injunction, regulation, or moratorium went into effect. To the extent that a ripeness analysis is required, however, we conclude that the trial court properly found the Partnership's claim was not ripe because the Partnership never tested the injunction or obtained a final authoritative decision regarding the extent of the regulation on the use of its property. See Tinnerman v. Palm Beach County, 641 So.2d 523, 525 (Fla. 4th DCA 1994); see also, e.g., Palazzolo v. Rhode Island, 533 U.S. 606, 121 S.Ct. 2448, 2459, 150 L.Ed.2d 592 (2001).

III.
We further find that the trial court properly concluded the Partnership had not shown it was deprived of all or substantially all economically beneficial use of its property such that a temporary regulatory taking had occurred under the test set forth in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In Lucas, the United States Supreme Court explained that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." 505 U.S. at 1019, 112 S.Ct. 2886. The Court indicated, however, that the situations are "relatively rare" where the government deprives a landowner of "all economically beneficial uses." Id. at 1018, 112 S.Ct. 2886. We note that the Partnership has proceeded in its temporary regulatory taking claim only on the theory that a temporary taking occurred under the Lucas test, arguing that the injunction effectively deprived it of all economically beneficial use of its property.

A.
"[A] temporary deprivation may constitute a taking." Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 640 So.2d 54, 58 (Fla. *469 1994); see First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). See also Keshbro, Inc. v. City of Miami, 801 So.2d 864, 871 (Fla. July 12, 2001). In analyzing temporary takings, many courts look to the United States Supreme Court's decision in First English. See Keshbro, 801 So.2d at 871. Reliance upon First English for the threshold determination of whether a taking has occurred is, however, suspect.
In First English, a church alleged that a regulatory taking had occurred when, because of flooding, the County of Los Angeles adopted an ordinance prohibiting building or rebuilding on certain land, which included land owned by the church. See 482 U.S. at 307-08, 107 S.Ct. 2378. Because of the posture of the case, the United States Supreme Court assumed that the regulation at issue resulted in a taking and considered only the question of an appropriate remedy. See id. at 311-13, 107 S.Ct. 2378. The church's complaint alleged that the ordinance had denied it all use of the affected property and the church sought damages for this deprivation. See id. at 312, 107 S.Ct. 2378. Citing the California Supreme Court's decision in Agins v. City of Tiburon, 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), aff'd, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), the trial court granted the defendants' motion to strike the allegation that the church had been denied all use of the subject property. See id. at 308-09, 598 P.2d 25. The Court explained that in Agins, "the California Supreme Court decided that a landowner may not maintain an inverse condemnation suit in the courts of that State based upon a `regulatory' taking." Id. at 308, 598 P.2d 25. The Court further explained the Agins decision:
In the court's view, maintenance of such a suit would allow a landowner to force the legislature to exercise its power of eminent domain. Under this decision, then, compensation is not required until the challenged regulation or ordinance has been held excessive in an action for declaratory relief or a writ of mandamus and the government has nevertheless decided to continue the regulation in effect.
Id. at 308-09, 598 P.2d 25. The California Court of Appeal also relied on Agins and affirmed the trial court's decision to strike the allegations concerning the ordinance. See id. at 309, 598 P.2d 25. The California Supreme Court denied review. See id. The United States Supreme Court thus explained the constitutional issue before it:
Appellant asks us to hold that the California Supreme Court erred in Agins v. Tiburon in determining that the Fifth Amendment, as made applicable to the States through the Fourteenth Amendment, does not require compensation as a remedy for "temporary" regulatory takingsthose regulatory takings which are ultimately invalidated by the courts.
Id. at 310, 598 P.2d 25. In particular, the Court pointed out that "the allegation of the complaint which we treat as true for purposes of our decision was that the ordinance in question denied appellant all use of its property." Id. at 321, 598 P.2d 25. The Court explained that "`temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." Id. at 318, 598 P.2d 25. The Court held that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." Id. at 321, 598 P.2d 25. Importantly, the *470 Court noted, "We limit our holding to the facts presented, and of course do not deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." Id.

B.
The First English discussion of temporary takings referred to "retrospectively temporary takings," that is, "the Court used the term `temporary taking' to refer to the period before a regulatory taking is invalidated...." Keshbro, 801 So.2d at 873. Indeed, as explained above, "First English really involved a question of remedies...." Id.
In Keshbro, however, the Florida Supreme Court had before it the threshold issue of whether a compensable taking could occur under Lucas when nuisance abatement boards ordered, prospectively, temporary closures of certain buildings. Id. at 866. The court declined to distinguish "retrospectively temporary takings" from "prospectively temporary takings" for purposes of applying the Lucas analysis to nuisance cases. Id. at 871. Nevertheless, the court noted that, in cases involving land use and planning concerns, courts have refused to extend First English beyond a situation involving retrospectively temporary takings:
[T]he courts refusing to extend First English beyond its remedial genesis to prospectively temporary regulations have done so in the land use and planning arena, where an entirely different set of considerations are implicated from those in the context of nuisance abatement where a landowner is being deprived of a property's dedicated use. The concerns specific to the regulation of land use and planning were noted by the Ninth Circuit in declining to apply Lucas's categorical takings analysis to the temporary takings claims of landowners in the Lake Tahoe region with regard to a temporary moratorium on development instituted in an effort to stem the environmental degradation of Lake Tahoe:
[T]he widespread invalidation of temporary planning moratoria would deprive state and local governments of an important land-use planning tool with a well-established tradition. Land-use planning is necessarily a complex, time-consuming undertaking for a community, especially in a situation as unique as this. In several ways, temporary development moratoria promote effective planning. First, by preserving the status quo during the planning process, temporary moratoria ensure that a community's problems are not exacerbated during the time it takes to formulate a regulatory scheme. Relatedly, temporary development moratoria prevent developers and landowners from racing to carry out development that is destructive of the community's interests before a new plan goes into effect. Such a race-to-development would permit property owners to evade the land-use plan and undermine its goals. Finally, the breathing room provided by temporary moratoria helps ensure that the planning process is responsive to the property owners and citizens who will be affected by the resulting land-use regulations.
Id. (quoting Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 216 F.3d 764, 777 (9th Cir.2000) (citations and footnote omitted), cert. granted in part, ___ U.S. ___, 121 S.Ct. 2589, 150 L.Ed.2d 749 (2001) (granting certiorari petition on the following question: "Whether the Court of Appeals properly determined that a temporary moratorium on land development *471 does not constitute a taking of property requiring compensation under the Takings Clause of the United States Constitution?")). The reference to land planning moratoria is more helpful in the present case than is Keshbro. We acknowledge the Keshbro rule allowing a prospective taking, but note that the factual impetuses for that casenuisance abatement boards' actions in temporarily closing motels and apartments where criminal activity had occurred are far removed from those now before us.

C.
In Tahoe-Sierra, the Ninth Circuit held that a temporary moratorium on development did not amount to a categorical taking under Lucas because it did not result in the deprivation of all of the value or use of the property. See 216 F.3d at 782. Under the Tahoe-Sierra analysis, no temporary taking is wrought by virtue of a development moratorium where the future use of property has a substantial present value. 216 F.3d at 781. In that case, the moratorium lasted thirty-two months. See id. Here, the injunction lasted twenty-two months. In light of Lucas, we agree with the reasoning of the Ninth Circuit that a temporary land use regulation could rarely, if ever, completely deprive the owner of all economically beneficial use:
Of course, were a temporary moratorium designed to be in force so long as to eliminate all present value of a property's future use, we might be compelled to conclude that a categorical taking had occurred. We doubt, however, that a true temporary moratorium would ever be designed to last for so long a period.
Id. at 781. Like the situation in Tahoe-Sierra, the injunction here was designed to suspend certain development only until the County completed the stormwater study required by the Comprehensive Plan. See id. Even though a moratorium may restrict or delay temporarily the use of property for development purposes, it can hardly be said that a moratorium that was temporary from the outset destroys the economic value of the property. Indeed, nothing in the present record suggests that the property owned by the Partnership completely, or even substantially, lost its present value by virtue of the temporary injunction. Thus, our conclusion, similar to the result in Tahoe-Sierra, does not conflict with Lucas.

IV.
A truly temporary land use injunction or moratorium looks more like a permitting delay than a compensable regulatory taking. Many communities have, through state and local elected officials, expressed a preference for strict land use control. In such locales, a developer may labor months or years to obtain all necessary approval for a substantial development. This is essentially what the circuit judge observed in his order when he noted "the general restrictive environment for commercial development in Leon County." In such an environment, the timetable established by a commercial developer must anticipate delays, whether occasioned by holdups in the permitting process, litigation by neighboring land owners, or a temporary development injunction or moratorium.
Our decision here, as well as that of the trial court, reflects the role of courts versus the role of local bodies in these types of disputes. Courts do not generally interfere with local regulatory bodies in matters, including land use regulation, simply because legislation or regulation may be unwise or economically unsound. Courts constrain such bodies only where regulations are illegal or unconstitutional. As the Court indicated in Lucas, the situations are "relatively rare" where the government deprives a landowner of "all economically *472 beneficial uses." 505 U.S. at 1018, 112 S.Ct. 2886. Close regulation by local government that is merely expensive or time consuming for developers does not arise to a taking. Such regulation presumably expresses the will of local citizens who have elected governing boards such as county and city commissions. Thus, the question of regulation in situations such as the one now before us, presents a political rather than a justiciable issue. The regulatory taking analysis of Lucas is consistent with this view.
AFFIRMED.
ALLEN, C.J., and DAVIS, J., concur.