873 So.2d 460 (2004)
LEON COUNTY, Florida, Appellant,
v.
G.J. GLUESENKAMP, Jr., et al., Appellees.
No. 1D02-4658.
District Court of Appeal of Florida, First District.
May 10, 2004.
Herbert W.A. Thiele, County Attorney; Daniel J. Rigo, Assistant County Attorney, Tallahassee; Robert H. Freilich, Esq. of Freilich, Leitner & Carlisle, Kansas City, for Appellant.
*461 Carl R. Pennington, Jr., Esq. of Pennington, Moore, Wilkinson, Bell & Dunbar, P.A., Tallahassee, for Appellees.
VAN NORTWICK, J.
In another case arising out of the disputes concerning the land use regulation in the Bradfordville area of northern Leon County, the County appeals a partial final judgment and final judgment in favor of appellees, G.J. Gluesenkamp, Jr., Josephine Gluesenkamp, and Blue Chip Investment Partnership, a partnership owned by the Gluesenkamps. In the orders on appeal, the trial court ruled that the County had breached a Development Agreement between it and appellees' predecessors-in-interest by effectively prohibiting appellees from developing their Bradfordville area property pursuant to the Development Agreement and that the County's actions resulted in a compensable temporary taking of appellees' property. The trial court awarded appellees damages of $130,000, measured by the fair rental value of appellees' property during the period in which the County's actions prohibited the development of their property. Because the County's performance of its obligations under the Development Agreement was prevented by the existence of a court-ordered injunction, we conclude that the County did not breach the Development Agreement. Further, we hold that the delay in the development of appellees' property did not constitute a compensable temporary taking under Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), and Bradfordville Phipps Limited Partnership v. Leon County, 804 So.2d 464 (Fla. 1st DCA 2001), review denied, 829 So.2d 916 (Fla.2002). Accordingly, we reverse and remand for proceedings consistent with this opinion.

Factual and Procedural Background
On December 6, 1995, the County amended the 2010 Tallahassee-Leon County Comprehensive Plan by adding Land Use Goal 8 (Goal 8), which provided for the development and implementation of a comprehensive stormwater management plan for the Bradfordville Study Area (BSA). On February 24, 1998, the County entered into a Development Agreement with appellees' predecessors-in-interest, Robert G. Lauder, Wilma B. Lauder, and Fred J. Petty (jointly, the Lauders), which set forth the terms under which the Lauders and the County would work together in the planning and acquisition of property for certain long-planned road expansion projects in the BSA, including a regional stormwater management facility. The real property subject to the Development Agreement included 178.58 acres owned by the Lauders and 1.3 acres owned by the Florida Department of Transportation (DOT). Pursuant to the Development Agreement, the Lauders agreed to transfer to the County 10.879 acres for the construction of regional stormwater management facilities, control structures, and inflow structures to handle any runoff from the property. The County and DOT were to be responsible for any required environmental studies and all design, engineering, regulatory approval, permitting, and construction of the stormwater facility. The Lauders agreed to pay the County a one-time maintenance fee of $90,000 in the event that improvements on their property connected to the stormwater facility. The Development Agreement also provided that the Lauders, their grantees, assignees, or lessees would be responsible for obtaining the necessary development orders for any improvements on the property governed by the Development Agreement, except for the construction of the stormwater management facility.
*462 On April 27, 1998, various parties filed suit challenging the County's adherence to the Comprehensive Plan including, among other things, the action of the County in entering into the Development Agreement (the Lake McBride Action). On April 30, 1998, appellees purchased three lots from the Lauders for a price of approximately $600,000; these lots were a portion of the property subject to the Development Agreement. On December 15, 1998, the trial court entered a written injunction order in the Lake McBride Action, prohibiting the County
from issuing any future building permits or other development permits authorizing construction within the Bradfordville Study Area until such time as the County comes into compliance with 8.1, 8.3.1 and 8.5.2 of the Land Use Element of the Tallahassee/Leon County Comprehensive Plan.
Although the injunction, which was to be dissolved when the County remedied its non-compliance with the Comprehensive Plan, was not to apply to any activities already grandfathered in by law, it was applicable to all pending and future permit applications. On January 12, 1999, the County and the plaintiffs in the Lake McBride Action entered into an Interim Settlement Agreement (ISA), by which the County agreed not to appeal the injunction order. The following day, the trial court modified its injunction by excluding from its scope certain properties as agreed upon by the County and the Lake McBride plaintiffs. The appellees' property remained subject to the injunction.
In February 1999, appellees prepared plans and specifications for the purpose of constructing a single-family residence on one of their three lots and applied for a building permit and an environmental management permit. That same month, the County informed appellees by letter that it was unable to issue a development permit due to the court's injunction in the Lake McBride Action.
On March 2, 1999, appellees filed the action against the County which is the subject of this appeal, asserting five claims for relief, including claims for inverse condemnation, declaratory relief, specific performance, breach of contract, and injunctive relief. With respect to the breach of contract claim, appellees alleged that the County beached the Development Agreement by failing and refusing to issue appellees a building permit as required by that contract. With respect to the inverse condemnation claim, appellees alleged that the County's acts and omissions, including entering into the ISA, agreeing to actively take steps to breach the Development Agreement, and agreeing not to appeal the injunction order, constituted a substantial interference with appellees' property rights resulting in a taking of appellees' property.
On December 14, 1999, as part of its efforts to comply with the Comprehensive Plan and the injunction in the Lake McBride Action, the County adopted an Interim Development Ordinance (IDO), restricting the issuance of development permits for land in the BSA. The IDO's term, which was limited to seven months unless extended by a majority vote of the Board of County Commissioners, served to allow the County to complete all necessary studies with regard to the stormwater issues in the BSA. On July 11, 2000, the County adopted an ordinance that implemented the provisions of Goal 8. On November 22, 2000, the trial court dissolved the injunction in the Lake McBride Action. On June 5, 2001, appellees sold their three lots for a price of $1,094,050.
On April 12, 2002, the trial court in the instant action entered its partial final judgment. There, the trial court determined *463 that appellees' claims for declaratory judgment, specific performance, and injunctive relief were rendered moot by appellees' sale of the property. As to the breach of contract claim, the trial court found that the County prohibited appellees from developing their property in accordance with the terms of the Development Agreement by entering into the ISA and enacting the IDO. With respect to the taking claim, the trial court ruled that appellees had suffered a loss of all or substantially all economically viable uses of the three lots sufficient to constitute a categorical taking pursuant to Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The trial court distinguished our decision in Bradfordville Phipps on the basis that the parties in that case had not entered into a Development Agreement which clearly sets forth the rights of the parties. The trial court's order found that appellees' loss of use of their property was not reasonably based upon land use planning delays. In its final judgment, the trial court ruled that appellees were entitled to damages of $130,000, which represented the fair rental value of the property for the loss of the use of the property from January 13, 1999, through November 22, 2000, for either the breach of contract or for the taking claims. This appeal followed.

Breach of Contract Claim
The County contends that the trial court erred in ruling that the County prohibited appellees from developing their property. The County argues that it was the court-ordered injunction in the Lake McBride Action which prohibited development and that the County was obligated to obey the injunction notwithstanding the terms of the Development Agreement. We agree.
"An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn.... A contract provision the performance of which has been enjoined is unenforceable." W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 766-67, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (citing Restatement (Second) of Contracts §§ 261 & 264 (1981) (other citations omitted); see also The Fla. Bar v. Furman, 451 So.2d 808, 813 (Fla.1984) (holding that an injunction must be obeyed until it is vacated or modified by the court awarding it or a superior authority, or until the order or decree granting it is reversed on appeal). The rule applicable here arises from the general principle under which a party's contractual obligation is discharged when the party's performance of the contract is prevented by governmental order. Section 261 of the Restatement (Second) of the Law of Contracts explains:
Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
"It is `a basic assumption on which the contract was made' that the law will not directly intervene to make performance impracticable when it is due." Restatement (Second) Law of Contracts § 264 cmt. BB 3.5 (p. 39)(1981). Thus, section 264 of the Restatement (Second) Law of Contracts provides: "If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." This rule is applicable even though the party invoking the defense, as the County here, is a governmental entity, provided the law or governmental *464 action frustrating performance was not adopted or enacted with the intent of relieving the governmental entity of its contractual obligation. See, e.g., City Line Joint Venture v. United States, 48 Fed. CI. 837, 840 (Fed.Cl.2001).
In the instant case, the trial court in the Lake McBride Action enjoined the County from issuing any future building or development permits authorizing construction within the BSA until the County came into compliance with certain provisions of the Comprehensive Plan. Notwithstanding the County's decision to enter into the ISA with the Lake McBride plaintiffs and the County's subsequent enactment of the IDO, it was not until the trial court dissolved the injunction in November 2000 that the County was able to issue building permits to appellees. Further, the record is undisputed that, in the negotiations leading up to the ISA, the County sought to exclude as much property as possible from the operation of the injunction. The record reflects that the plaintiffs in the Lake McBride Action refused to agree to exclude appellees' land from the coverage of the injunction. Similarly, as this Court previously determined in Bradfordville Phipps, the County adopted the IDO as part of its effort to comply with both the injunction and the Comprehensive Plan. See Bradfordville Phipps, 804 So.2d at 466. Therefore, to the extent that the County had an obligation pursuant to the Development Agreement to issue permits to appellees for the development of their property, the obligation was excused based upon the trial court's injunction in the Lake McBride proceeding. See W.R. Grace and Co., 461 U.S. at 766-67, 103 S.Ct. 2177; Furman, 451 So.2d at 813. Accordingly, the County's actions did not constitute a breach of the Development Agreement.[1]

Taking Claim
"[A] temporary deprivation may constitute a taking." Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 640 So.2d 54, 58 (Fla. 1994) (citing First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). In Bradfordville Phipps, this Court has previously addressed the issues raised in this appeal with respect to the temporary takings claim. There, the appellant partnership challenged a trial court order which had denied its motion for summary judgment in favor of the appellee, Leon County. Bradfordville Phipps, 804 So.2d at 465. The partnership, which owned land in the BSA, had filed an inverse condemnation action against the County following the imposition of the court-ordered injunction in the Lake McBride Action. Id. As did appellees in the instant case, the partnership alleged that the County's actions in consenting to the entry of an order enjoining it from issuing any further development permits and in agreeing not to appeal any order that may be entered enjoining the issuance of permits for the development of the subject property substantially deprived the partnership of the beneficial use of its property and constituted a taking. Id. at 466. We held that the trial court properly concluded that the partnership had not shown that it was *465 deprived of all or substantially all economically beneficial use of its property such that a temporary regulatory taking had occurred under the test set forth in Lucas.[2]Id. at 468.
The trial court below and the appellees on appeal seek to distinguish Bradfordville Phipps and find controlling the Florida Supreme Court's decision in Keshbro, Inc. v. City of Miami, 801 So.2d 864 (Fla.2001). In Keshbro, the court addressed whether a compensable taking could occur under Lucas when nuisance abatement boards prospectively ordered temporary closures of a motel and an apartment complex. Both the trial court and appellees overlook, however, that we expressly distinguished Keshbro in Bradfordville Phipps. There, we explained that the factual impetuses in Keshbro, the criminal activity requiring the temporary closure of a motel and an apartment complex, were far removed from those then before this Court. Bradfordville Phipps, 804 So.2d at 471. More importantly, in Keshbro, the supreme court explained that an "entirely different set of considerations are implicated from those in the context of nuisance abatement where a landowner is being deprived of a property's dedicated use" in the land use and planning arena. Keshbro, 801 So.2d at 874. Thus, the reliance of the trial court and appellees upon Keshbro is misplaced.
In Bradfordville Phipps, we concluded that a temporary land use regulation could rarely, if ever, completely deprive the owner of all economically beneficial use and adopted the reasoning of the Ninth Circuit Court of Appeals' decision in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 216 F.3d 764 (9th Cir.2000), affirmed, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). 804 So.2d at 471. Like the situation in Tahoe-Sierra, we concluded that the injunction at issue was designed to suspend certain development only until Leon County completed the stormwater study required by the Comprehensive Plan. Id. We noted that, even though a moratorium may restrict or temporarily delay the use of property for development purposes, it could hardly be said that a temporary moratorium destroys the economic value of the property. Id. In the orders on appeal, the trial court rejected the rationale of Tahoe-Sierra, finding that "[t]he land use planning rationale behind Tahoe-Sierra is clearly not applicable to the case at hand."
Subsequent to our Bradfordville Phipps decision, the United States Supreme Court affirmed the Ninth Circuit's decision in Tahoe-Sierra. See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). The Supreme Court stated that the question presented was whether a moratorium on development imposed during the process of devising a comprehensive land use plan constituted a per se taking of property requiring compensation.[3] *466 Id. at 306, 122 S.Ct. 1465. Tahoe-Sierra involved two moratoria ordered by the respondent to maintain the status quo while studying the impact of development on Lake Tahoe. As a result of the two directives, virtually all development on a substantial portion of the property subject to the respondent's jurisdiction was prohibited for thirty-two months. Id. The petitioners argued that a temporary deprivation, no matter how brief, of all economically viable use triggered a per se rule that a taking had occurred. Id. at 303, 122 S.Ct. 1465. The Court explained that its decisions in Lucas and in First English did not support such a categorical rule and implicitly rejected a categorical rule in the regulatory taking context. 535 U.S. at 321, 122 S.Ct. 1465. The Court held that its precedents from the physical takings context were not applicable to regulatory takings claims, id. at 324, 122 S.Ct. 1465, and that the Lucas holding that the permanent obliteration of the value of a fee simple estate constitutes a categorical taking certainly did not answer the question of whether a regulation prohibiting any economic use of land for a thirty-two month period had the same legal effect. Id. at 330-31, 122 S.Ct. 1465. The Court explained that "a permanent deprivation of the owner's use of the entire area is a taking of `the parcel as a whole,' whereas a temporary restriction that merely causes a diminution in value is not." Id. at 333, 122 S.Ct. 1465. "Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." Id. The Court concluded that, rather than attempting to craft a new categorical rule applicable to regulatory monitoring, "the circumstances in this case are best analyzed within ... the framework" in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). 535 U.S. at 342, 122 S.Ct. 1465. Tahoe-Sierra emphasized that the Court's regulatory takings jurisprudence "is characterized by `essentially ad hoc, factual inquiries'" id. at 322, 122 S.Ct. 1465, (quoting Penn Central, 438 U.S. at 124, 98 S.Ct. 2646), that are "designed to allow `careful examination and weighing of all the relevant circumstances,'" id. at 322, 122 S.Ct. 1465 (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 636, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)). The Court noted the importance of the "multifactor inquiry generally applicable to nonpossessory governmental activity,'" id. at 325 n. 18, 122 S.Ct. 1465 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)), and that it has "`generally eschewed' any set formula for determining how far is too far, choosing instead to engage in `essentially ad hoc, factual inquiries.' " Id. at 326, 122 S.Ct. 1465.
As we previously explained in Bradfordville Phipps, a temporary land use regulation could rarely, if ever, completely deprive the landowner of all economically beneficial use. See 804 So.2d at 471. "A truly temporary land use injunction or moratorium looks more like a permitting delay than a compensable regulatory taking." Id. Thus, "the timetable established by a commercial developer must anticipate delays, whether occasioned by holdups in the permitting process, litigation by neighboring land owners, or a temporary development injunction or moratorium." Id. More significantly, under the Court's holding in Tahoe-Sierra, the development moratorium *467 could not constitute a per se taking of property under Lucas, contrary to the trial court's ruling in the orders on appeal. See Tahoe-Sierra, 535 U.S. at 325-26, 122 S.Ct. 1465.
We also conclude that the development moratorium before us does not constitute a taking under the Penn Central analysis adopted in Tahoe-Sierra. In Penn Central, the Court identified three factors to apply when engaging in an analysis of whether a regulation constitutes a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. See Penn Cent., 438 U.S. at 124, 98 S.Ct. 2646.
With respect to the Penn Central economic impact criterion, a plaintiff must establish "`a serious financial loss from the regulatory imposition.'" Bass Enters. Prod. Co. v. United States, 54 Fed. CI. 400, 403 (Fed.Cl.2002) (quoting Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed.Cir.1994)). The focus of this factor is on the change in fair market value of the subject property caused by the regulatory imposition. Id. In other words, the court must compare the value that has been taken from the property with the value that remains in the property. Id. (citing Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)); see also Cane Tenn., Inc. v. United States, 57 Fed. Cl. 115, 123 (Fed.Cl.2003) (holding that the proper measure of economic impact is a comparison of the market value of the property immediately before the governmental action with the market value of that same property immediately after the action).
In the instant case, the record contains little evidence concerning changes in the market value of appellees' property during the period in which the injunction was in place. We note, however, that appellees purchased the three lots in 1998 for approximately $600,000 and, following the dissolution of the injunction in the Lake McBride Action, appellees sold these three lots in 2001 for $1,094,050, making a profit of almost $500,000. Thus, nothing in the record shows the County's inability to issue appellees a building permit over the course of the injunction decreased the fair market value of appellees' property. See Cane Tenn., Inc., 57 Fed. Cl. at 123 (noting that recoupment can be relevant in determining whether a taking has occurred and setting forth that it is less likely that a taking has occurred if a party is able to recoup its investment after the governmental action).
The Penn Central investment-backed expectation factor limits a takings recovery to plaintiffs who can establish that they "`bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" Bass Enters. Prod. Co., 54 Fed. Cl. at 403 (quoting Loveladies Harbor, Inc., 28 F.3d at 1176). Here, although the court-ordered injunction and the County's inability to issue building permits during that period of time did not exist when appellees purchased their property, the Lake McBride Action had commenced prior to appellees' purchase. Furthermore, it is undisputed that at the time appellees purchased the subject property, the development of a stormwater management plan for the BSA pursuant to the Comprehensive Plan and Goal 8 had been ongoing for many years. Under the existing regulatory regime, in 1998, any reasonable real estate investor or developer should have anticipated that future restrictive regulations were likely to be imposed and that such governmental *468 actions might adversely affect development plans.
With respect to the Penn Central factor relating to the character of the government action, "[a] `taking' may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent., 438 U.S. at 124, 98 S.Ct. 2646. In determining the character of the government action, courts must weigh the "`purpose and importance of the public interest reflected in the regulatory imposition'" and balance appellees' interests against the County's needs to protect the public. See Bass Enters. Prod. Co., 54 Fed. Cl. at 403 (quoting Loveladies Harbor, Inc., 28 F.3d at 1176).
In the instant case, the Comprehensive Plan and, more specifically, Goal 8 recognized that potential stormwater problems would likely be caused by future development in the BSA and set forth objectives in furtherance of the public interest. Any interference in the County's ability to issue appellees a building permit resulted from the court-ordered injunction that effectively forced the County to complete the necessary studies with regard to the stormwater issues in the BSA. In weighing the purpose and importance of the public interest with respect to the Comprehensive Plan and appellees' interest in developing their property, we find that it was reasonable for the County to decline to issue appellees a building permit based upon the existence of the court-ordered injunction and its attempt to comply with the Comprehensive Plan.
In summary, because the trial court erred in ruling that the County breached the Development Agreement and that a temporary taking had occurred pursuant to Lucas, we reverse both the Partial Final Judgment and the Final Judgment and remand for further proceedings.
REVERSED and REMANDED.
BOOTH and BENTON, JJ., concur.
NOTES
[1] The County also argues that damages as a remedy for breach of contract are not permissible because section 163.3243, Florida Statutes (1997), which is part of the Florida Local Government Development Act, prescribes that an aggrieved or adversely affected person may file an action for injunctive relief and makes no mention of damages as a breach of contract remedy. Because we hold that the County's actions did not constitute a breach of the Development Agreement, we find it unnecessary to address this argument.
[2] As did appellees in the instant case, the partnership in Bradfordville Phipps based its temporary regulatory taking claim solely on the theory that such a taking had occurred under the test in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In Lucas, the petitioner purchased two residential lots on a South Carolina barrier island, intending to build single-family residential homes. Id. at 1003, 112 S.Ct. 2886. Two years later, the South Carolina legislature enacted a statute which prohibited the petitioner from building any permanent habitual structures. Id. The Court explained that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is to leave his property economically idle, he has suffered a taking." Id. at 1019, 112 S.Ct. 2886. The Lucas court indicated, however, that such a situation was relatively rare. Id. at 1018, 112 S.Ct. 2886.
[3] The Court noted that the only question before it was whether the rule set forth in Lucas applied. Id. at 318, 122 S.Ct. 1465.