936 So.2d 55 (2006)
OSCEOLA COUNTY, Florida, et al., Appellants,
v.
BEST DIVERSIFIED, INC., and Peter L. Huff, et al., Appellees.
Nos. 5D04-216, 5D04-217.
District Court of Appeal of Florida, Fifth District.
August 11, 2006.
*56 Steven L. Brannock and David C. Borucke, of Holland & Knight LLP, Tampa, *57 Scott J. Johnson of Holland & Knight, LLP, Orlando, and Jo O. Thacker, Osceola County Attorney, Kissimmee, for Appellant Osceola County, Florida.
L. Kathryn Funchess, Assistant General Counsel, Department of Environmental Protection, Tallahassee, for Appellant Department of Environmental Protection.
James L. Bennett, Chief Assistant County Attorney, Clearwater, for Amicus Curiae.
Tracy A. Marshall, Mickey R.E. Ware, Dyana L. Petro and Monterey Campbell, of Gray, Robinson, P.A., Orlando, for Appellees.

ON MOTION FOR REHEARING
PER CURIAM.
Appellant, Osceola County, has filed a motion for rehearing and for rehearing en banc. We grant the motion for rehearing, withdraw our prior opinion and issue the following opinion in its place.
Osceola County ["County"] and the Florida Department of Environmental Protection ["DEP"] appeal a final judgment that awarded damages to Peter Huff and Best Diversified, Inc. ["Huff"] as the owner and operator of a landfill. We conclude there is no evidence to support a determination that either the DEP or Osceola County engaged in a taking of the property, and thus reverse the judgment in its entirety.
This case involves a forty-acre landfill operated as a construction and demolition debris facility in Osceola County.[1] The property has been used as a landfill since the 1960s. The landfill was not regulated by either the County or the DEP until the early 1990s.
In 1991, Huff's predecessor in interest obtained a five-year permit from the DEP to operate a construction and demolition debris facility on the property. A request was also submitted to the County to approve the construction and demolition facility as a conditional use of the property.[2] The Osceola Board of County Commissioners approved the request subject to numerous conditions. The approval was for five years and required the applicant to reapply at the end of that time for further approval.
Huff acquired the property in 1992 and the DEP's permit was later transferred to him. In 1995, residents of a nearby subdivision began complaining about odors emanating from the landfill. The cause of the problem was believed to be gypsum wallboard, one of the construction materials deposited in the landfill. When wet, gypsum wallboard emits hydrogen sulfide, a gas which smells like rotten eggs. Huff tried various methods to contain or neutralize the gas, but the complaints continued.
In March 1996, Huff applied to the DEP for a permit to continue operating at the landfill. A few months later, Huff submitted his request to the County for approval to continue the conditional use of the property as a landfill.
In November 1996, the DEP denied Huff's requested permit because of the continuing complaints from nearby residents of foul odors, investigations by the DEP which linked the odors to the landfill, and the lack of a showing that the facility *58 would be operated in a manner to control emission of these odors. The DEP specifically found the current operation of the facility constituted a public nuisance. Huff sought administrative review of this decision and, pending the administrative process, he was able to continue operating the landfill under the permit.
In February 1997, the Osceola Board of County Commissioners denied Huff's request for a conditional use, meaning that the landfill was no longer able to operate. Odor complaints from the homeowners stopped shortly thereafter.
Huff filed another application for conditional use of the property, but that request was again denied by the Board of County Commissioners in August 1998. A year later, Huff filed this lawsuit against the County and DEP seeking damages under a theory of inverse condemnation and under the Bert J. Harris, Jr. Private Property Rights Protection Act.[3]
In November 1999, Huff withdrew his request for administrative review of the DEP's denial of his permit to operate the landfill. He also filed a "Notice of Acceptance of Agency Action," which provides as follows:
Plaintiffs, BEST DIVERSIFIED, INC., a Florida corporation, and PETER HUFF, hereby provide formal notice that they accept the actions of Defendants, OSCEOLA COUNTY and the STATE OF FLORIDA, DEPARTMENT OF ENVIRONMENTAL PROTECTION, in connection with the Defendant's denial of permit(s) to Plaintiffs for the operation of a landfill in Osceola County. Plaintiffs waive any and all rights to further challenge the propriety of the agency actions and rules. However, Plaintiffs reserve the right to maintain this action for inverse condemnation and relief under the Bert J. Harris Act.
At the trial, both the County and DEP objected to any testimony regarding the propriety of their decisions to deny conditional use approval and the issuance of a permit. The County and DEP argued Huff's failure to seek appropriate administrative relief and his acceptance of their actions rendered this evidence improper. Their objections were overruled and Huff was able to present witnesses and evidence that the facility was ordered to shut down because of political pressure from the nearby residents, even though it was never scientifically determined the facility was the cause of the odor and Huff had spent large sums to implement an odor abatement system.
The trial court determined the County and DEP simply weighed the interests of the nearby residents against the interests of Huff and concluded the residents' interests trumped Huff's. The court also determined the County and DEP had imposed standards on Huff which made it impossible for him to continue operating the facility or to close it. Thus it was unsuitable for any other use. Such actions, according to the court, constituted an ouster of Huff from his property entitling him to relief under both his Harris Act and inverse condemnation claims.
The County and DEP appealed but their appeal was dismissed for lack of jurisdiction. Osceola County v. Best Diversified, Inc., 830 So.2d 139 (Fla. 5th DCA 2002). A jury was then impaneled to determine Huff's damages. It awarded Huff $1,415,000 on his inverse condemnation *59 claim and $1,410,000 on his Harris Act claim. Harris elected the remedy of inverse condemnation and a final judgment was entered vesting title to the property in the County and DEP and requiring them to pay $1,415,000 to Huff.
The threshold issue on appeal is whether Huff was entitled to compensation from the County and DEP when his request for a conditional use and permit were denied based on their determination the facility was the cause of noxious odors and constituted a public nuisance. The answer is clearly no. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (harmful or noxious uses of property may be proscribed by government regulation without the requirement of compensation); Keshbro, Inc. v. City of Miami, 801 So.2d 864 (Fla.2001) (regulation eliminating the value of private property effects a taking unless the purpose of the regulation is to control a public nuisance); State, Department of Environmental Protection v. Burgess, 667 So.2d 267 (Fla. 1st DCA 1995) (if landowner's proposed use of property constituted a nuisance, use was not part of landowner's property interests and compensation for denial of fill and dredge permit required for such use would not be due landowner on a theory of a constitutional taking).
In making this determination, we note that the trial court erred in reviewing the propriety of the County's action in denying Huff's application for conditional use approval and the DEP's action in denying him a permit. The Board of County Commissioners denied Huff's application for conditional use approval because of concerns about past violations at the landfill and the continuing odor problems. The DEP denied Huff a permit based on odor complaints, specifically finding that the current operation of the facility constituted a public nuisance.
If the County or the DEP acted improperly, Huff should have sought appropriate administrative and judicial review of those actions. Huff did not do so. He dismissed his administrative appeal of the DEP's decision to deny him a permit and did not seek administrative or judicial review of the County's decision to deny his application for conditional use approval. Furthermore, Huff filed a notice specifically accepting the actions of the County and DEP and waiving any right to further challenge those actions. In these circumstances, Huff may no longer challenge the propriety of the actions of the County and DEP in denying the conditional use approval and a permit.[4]
The remaining question is whether the DEP and/or the County effected a compensable taking by refusing to allow Huff to close the landfill in accordance with DEP requirements in order to put the property to other non-landfill uses. There is simply no evidence that the County kept Huff from closing the landfill in accordance with law or engaged in any conduct amounting to a taking.[5] Inverse condemnation *60 is a cause of action by a property owner to recover the value of property that has been de facto taken by an agency having the power of eminent domain where no formal exercise of that power has been undertaken.[6]Rubano v. Department of Transportation, 656 So.2d 1264 (Fla.1995); Sarasota Welfare Home, Inc. v. City of Sarasota, 666 So.2d 171 (Fla. 2d DCA 1995). A "taking" occurs when an owner is denied substantially all economically beneficial or productive use of the land. Huff's position on appeal was that the County inversely condemned the landfill by "preventing him from opening-to-close," but as a matter of law Huff had no right to open the landfill to close it. He only had the duty to close  to place a final cover of a twenty-four-inch thick soil layer, the upper six inches of which had to be capable of supporting vegetation, graded and compacted as necessary to eliminate ponding, promote drainage and minimize erosion. See Fla. Admin. Code R. 62-701.730(9).
The plaintiff's theory was that the County kept telling Huff that his proposals for the landfill after the permit and conditional use expired had to be part of a closure plan approved by DEP, but because the movement and placement of clean fill is not regulated by DEP, if Huff had asked DEP for its approval to deposit clean fill, he wouldn't have been able to get it. He asserted that by requiring this impossible task, the County prevented him from placing the required dirt on the landfill and restoring his property to any beneficial use.
There is no competent evidence in the record to support this entirely bogus claim. It is true that DEP doesn't regulate the placement of clean fill because, as the DEP witness explained, there is too much of it on the move every day in Florida and there is no real reason to do so. However, DEP does have the responsibility to regulate closure of construction and demolition debris landfills. See § 403.704(15), Fla. Stat. (1997); Fla. Admin. Code R. 62-701.730(1).
Here is how the closure procedure was described by Huff's own engineer:
Q Now, with respect to closure as of February of '97, what would have had to have happened for proper closure? First define for the Court what closure is because we're talking about closing the facility to not let it operate, but then we have closure. Can you distinguish between those for the Court?
A Sure. And I'll deal with closure because that's what I understand your question was framed around.
Q Yes, sir.
A In the normal course of conducting business activities, when a landfill reaches the final operational levels, in this case the final height that it was designed and intended to achieve, at that point there would be in accordance with the DEP regulations a notification to the DEP that that facility would embark on the normal standard closure.
And in accordance with the regulations in effect as of February 1997, that would include placing two foot of dirt over all portions of that said landfill that had not yet [sic] through the sequential closure  through the normal business activities prior to that date. You would *61 then place the two foot of dirt, achieve the proper grading and slopes on that landfill.
You would then seed and mulch that landfill to ensure that you got proper vegetative cover. You would verify that all activities had been terminated during that six-month period, that all necessary site cleanups had been undertaken, and that when you reached that final point where you felt closure was achieved, you would notify the DEP for them to come to verify that they concurred with closure being completed.
Q In your experience, the closure mechanic does not involve county regulations. These are DEP regulations?
A I have been specifically referring to DEP regulations to date, although the County has followed the DEP regulations as stipulated.
Q Now, you mentioned at the front end of your answer when you start the closure process, you used the word "notification." What is that? You said there was some notification.
A Under a general permit and even under the standard landfill permit, you would allow the DEP to know that you have reached the point of final operational level for the landfill. You would let them know that you were embarking on beginning the commencement of closure to ensure that they were aware and could verify that what you were about to close was consistent with what you said you intended to accomplish when you were given either your standard landfill permit or in this case a general permit.
Q And is this notification typically in writing, or you just call somebody on the phone and tell them you're going to do it? How does that happen?
A Not having the regulations in front of me, I don't recall it being in writing, but historically any notification would be in writing. It would usually be sent by certified mail return receipt requested.
Q And in February of '97, were you asked to notify DEP on behalf of Mr. Huff of an intent to close this facility?
A Since there was no intent to close, no sir, I was not.
Q And do you know whether Mr. Huff put the DEP on notice of any intent to close after the Board of County Commission meeting in February of '97?
A I do not have direct knowledge of all of Mr. Huff's activities, so it would be unfair for me to try to comment.
Q Do you have any knowledge or can you ballpark for us in February  following the February '97 Board of County Commission meeting if there was going to be this closure pursuant to notification what the cost would have been at that time?
A Leading up until February of 1997 with the anticipation that that facility would have continued to operate to reach the point where the final height of the cell reached the design level, we had estimated the final closure cost, since sequential closure was occurring simultaneously with operation, would have been approximately 300,000 dollars.
* * *
Q The fact that Mr. Huff told you to cease your efforts due to the result of the Board of County Commissioners in February of '97, do you believe in March of 1997, April, May, June, July and August of '97 that Mr. Huff had the financial ability to pay that much for closing costs without operating the facility to earn revenue to do so?
A I guess I can give you a two comment response to that. A, he told me he did not; B, I was not aware of Mr. Huff's financial ability.

*62 Q Did he tell you that he did not have the ability in that time period I'm talking about to close it without operating it to close?
A Yes.
The only issue as to this claim is whether the county wrongfully refused to let Huff do what he was entitled to do (i.e. close in accordance with section 62-701-730(9)) in order to restore the property to other uses after the landfill was ordered to cease operations on February 17, 1997. His right to operate a landfill in any manner had indisputably expired.
Osceola County made it clear to Huff, after his conditional use permit under Osceola County's zoning had expired, that the landfill had to be closed. Closure under the DEP regulations at a minimum required two feet of dirt cover. What the record shows clearly is that Huff made many proposals for the property after his zoning expired, but none involved showing up with two feet of dirt to close it; nor did Huff have the resources to close the landfill by placing the dirt cover; nor did he ever notify DEP of his intent to close in accordance with the regulations. His theory is that he is relieved of any of these burdens because the County's demand that DEP approve his closure plans was impossible because "DEP doesn't regulate clean fill."
Both sides agree that the key evidence on this issue of the County's refusal to let Huff close his landfill is found in the exchange of correspondence over an approximately one-year period between Huff's counsel and the County. This exchange of correspondence demonstrates without dispute that Huff had many different plans but he never attempted simply to close the landfill by following the closure procedure. What Huff wanted to do was to continue to operate the landfill and generate revenue over the remaining expected five-year life of the landfill, some of which would pay for the eventual fill, grading and dressing of the slopes five years hence when the landfill would close. According to the estimates, the continued operation of the landfill for the second five-year "expected life" would generate in excess of $10 million in revenues and the cost to apply a proper clean fill cover and maintenance subsequent to closure would be somewhere in the $300,000 to $450,000 range. The County's consistent response to these various schemes proposed by Huff was that he would have to get DEP to agree. If DEP agreed to his plan, the County would also.
The "closure" correspondence began in July 1997, a few months after the County disallowed continued operation of the landfill. Huff's counsel sent the Osceola County manager a "proposed business plan for closure." This basically consisted of a proposal for continued operation of the landfill for five more years as a construction and demolition debris facility, with assurances of monitoring hydrogen sulfide gas and odor management and promises of funds available at the end of the five years to fund closure according to a closure plan submitted to DEP ninety days before the last day waste is accepted.
Shortly thereafter, on August 8, Huff's counsel informed the Osceola County manager that Huff was going to "bring into the landfill material and equipment that will be used in grading and sloping the site in order to correct any drainage problems that may have arisen since the landfill ceased operation." This "material" turned out to be construction and demolition debris. When the County objected that this was exactly the activity that he was no longer allowed to undertake, Huff responded that he was not "operating a landfill" by placing this construction and demolition debris on the landfill because this was not construction and demolition debris *63 that was being dumped by a member of the public for a fee. Rather, he had contracted with "Gemini Waste Services, Inc." to perform compaction, grading and sloping at the site through the use of additional construction and demolition material. In essence, he contended that he had the right to dump whatever he wanted to onto the landfill so long as he was not "operating" a landfill. He contended that he had entered into a legitimate contract with Gemini to buy suitable construction and demolition material and he threatened a lawsuit for tortious interference with his contractual relationship with Gemini if the County did not allow him to proceed. As it turns out, Gemini was a corporation owned by Huff's wife. The County refused to allow this.
Next, the Osceola County manager was informed by letter dated December 31, 1997, that Huff "hope[d] to bring dirt fill material and crushed concrete onto the facility within the next week." Notably, this letter does not refer in any way to the use of this material for closure of the landfill or explain how crushed concrete might meet the closure requirement of a two-foot dirt cover. The response of the County was to inform Huff's counsel that in light of the expiration of the conditional use, Huff was required to close the landfill in accordance with applicable DEP regulations and, therefore, the only activities Huff would be allowed to conduct were those connected with closure of the facility. The letter continues:
If the activities your client seeks to conduct have been approved by the Department of Environmental Protection as part of the statutory closure plan requirements, please provide me with evidence of the Department's approval and I will promptly review same with staff. Assuming there are no questions, I am sure your client will be given authorization to proceed. However, if your client's proposal is not in connection with an approved closure plan, the activities your client intends to undertake are prohibited.
Shortly thereafter, Huff filed a notice of claim under the Harris Act and his counsel wrote to the Osceola County attorney a letter dated February 26, 1998, that included the following:
I think we can all agree that, rhetoric aside, we have an environmental problem on our hands that is in dire need of a solution. From our perspective, the critical issue is how to close the landfill in accordance with the applicable rules and regulations of the Department and continue to contain the odor control/maintenance system at the facility. In its simplest terms, the solution is purely an economic one: where do we find the money to accomplish what we all agree needs to be done? Since neither the State nor the County has expressed any interest in either purchasing the site or funding closure, the only alternative would appear to be to allow the landfill to generate sufficient funds to pay for the closure. How this will be allowed to occur is the problem we must address.
Transmitted with this letter for re-consideration by the County was the "open to close" business plan that had been transmitted the summer before.
On July 15, 1998, Huff's counsel again wrote to the county attorney the following:
Closure procedures have not been initiated for two reasons. First and foremost, it has been Mr. Huff's hope that the P & D Landfill would ultimately reopen. Second, the "final load" of material that would trigger the time frame for closure has not yet occurred. The Department of Environmental Protection ("Department") is aware of the status *64 of the landfill and has made no demand that Mr. Huff initiate closure.
* * *
The rules governing the operation of landfills promulgated by the Department of Environmental Regulation are rather strict on this issue and require that the landfill be properly closed for obvious health reasons. There are not many available options to achieve this purpose. Since neither the State nor Osceola County have expressed any interest in either purchasing this site or funding its closure, the only alternative is to allow Mr. Huff, either directly or through an operating or management agreement, to operate the facility in order to generate the funds necessary to close the landfill.
* * *
... The landfill has been in the same location for over twenty years. It has a limited life expectancy that can, with the proper guidelines, be used to generate the income necessary to fund proper closure.
The following week counsel sent a letter to a member of the Board of County Commissioners of Osceola County as follows:
Peter Huff has applied for a conditional use permit from Osceola County to reopen the P & D Landfill located on Old Lake Wilson Road in Kissimmee.... The purpose of the current application is to allow the facility to reopen in order to generate the monies necessary to properly close the facility in accordance with the requirements with the Department of Environmental Protection.... The problem facing Mr. Huff, as well as the State and Osceola County, is how to properly close the facility. Mr. Huff is aware that, as both the owner of the landfill and the property upon which it is located, he is ultimately responsible for properly closing the facility. Unfortunately, it takes money to do this properly and without a source of income to provide the necessary funds, Mr. Huff is unable to meet the closure requirements. Opening the facility to generate revenue to fund an escrow account dedicated to closing the landfill would appear to be the most reasonable option available to all concerned in order to insure closure of the facility in a timely manner.
The final correspondence contains the following:
[T]he purpose of the application was to reopen the landfill for the sole purpose of generating the funds necessary to properly close the facility pursuant to the requirements of the Department of Environmental Protection. The purpose of the application was not, as suggested by Ms. Payne, to meet `my client's desire to continue operating the landfill'. I can assure that Mr. Huff has only one desire, and that is to open the landfill in order to insure its proper closure. The requirement to properly close the facility remains in spite of the County Commission's action, and must, therefore, still be addressed.... In order to bring this matter to closure, Mr. Huff offers Osceola County the following options:
1. Purchase the property for $6.75 million;
2. Lease the facility from Mr. Huff for at a rate of [sic] $450,000 per year and assume the responsibility for closing the landfill. The lease would be for the length of time the County required to achieve this purpose; or
3. Issue a conditional use permit for the specific purpose of generating the funds necessary to properly close the facility.
Finally, the letter says this:

*65 As you know, neither the State of Florida nor Osceola County has any statutes, ordinances or rules that would prohibit Mr. Huff from accepting clean fill or inert material on the property. Nevertheless, last September, when Mr. Huff attempted to bring such material to the site in order to grade and slope the property as part of the closure process, the Osceola Code Enforcement staff issued citations to both Mr. Huff and the truck drivers. Mr. Huff was advised by at least one Code Enforcement staff that clean fill could be disposed of at the facility as long as Mr. Huff did not charge for the disposal. We have yet to receive a response from the County to our repeated inquiries as to the underlying authority for the County's action or why clean material could be disposed of without charge, but not accepted if there was any exchange of money. The conditional use permit that expired on February 17, 1997, specifically requires that the landfill be closed in accordance with the applicable rules of the Department of Environmental Protection. The use of clean fill is consistent with these rules, and is an allowed medium to achieve the proper sloping and grading necessary for closure. Mr. Huff intends to commence filling his property with this material on or about September 1, 1998, and would request the County's support in these efforts, or the authority under which the County would prohibit such activity.
The County responded by reiterating what it had said in January 1998  that if the activities Huff sought to conduct were approved by DEP as part of a statutory closure plan, the County will give authorization to proceed, but if Huff sought to undertake activities that were not in connection with an approved closure plan, such activities would be prohibited. No request for approval by DEP was ever made.
Clearly, after the expiration of his conditional use permit and the denial of his subsequent application to renew his conditional use permit in February 1997, Huff no longer had the right under the zoning laws of Osceola County to operate a landfill. Moreover, having ceased to operate a landfill under DEP regulations, he had an affirmative duty to close the landfill in accordance with DEP's regulations. Huff repeatedly offered to open the landfill in order to generate funds to "eventually" close it; he sought to dump more construction and demolition debris on the landfill to "improve its drainage." He informed the County on one occasion that he wanted to bring in crushed concrete. His final proposal appears to have been to operate as a "clean fill" landfill, challenging the County to explain why, if he could bring dirt on to close the landfill, he couldn't open it to generate revenue by accepting clean fill.[7]
The dissent's contention that the majority has misconstrued the applicable closure rules is useful for several reasons. First and foremost, it demonstrates that what controls the correct outcome of this case is a question of law, not one of "conflicting evidence."
There can be no doubt about Huff's legal position, which appears repeatedly in Huff's answer brief on appeal: "From February 1997, Huff sought one thing  `open to close'." [emphasis in original]. *66 According to Huff's counsel, "open" in this context meant "to operate the landfill." Huff's February 1998 statement of claim against the County summarizes his position in his own words:
Over the past year I have repeatedly tried to bring in material to properly slope and grade the Landfill as required by the Department's general permit, and have been frustrated by the County's position that any activity at the facility whereby I was able to make money was a commercial venture, and thereby prohibited. The conditional use permit issued by the County specifically required that the facility be closed in accordance with the Department's rules and regulations. The Department did not object to the use of either C & D material or clean fill to meet the closure requirements, yet the County issued citations when I attempted to bring in material specifically to meet the Department's closure requirements. Staff from the Code Enforcement Board told me that I could bring in as much "dirt" as I wanted, but no C & D material. The County has no rules governing the closure of landfills, yet required me to meet their standards which appear to be made up to fit the situation.
[emphasis added].
There is also no dispute about what the County did: it told Huff that if he wanted to "open to close" the landfill, he had to get DEP approval. This they had the absolute legal right to do.
The dissent apparently has concluded that DEP Rule 62-701.730(9)(b) allowed Huff to open the landfill to dump more material in order to "properly grade" the landfill. But the rule does no such thing. The rule says:
(b) Final cover and seeding or planting of vegetative cover shall be placed on each disposal unit within 180 days after it has reached its final grade. Final cover shall consist of a 24-inch-thick soil layer, the upper six inches of which shall be capable of supporting vegetation, and shall be graded and compacted as necessary to eliminate ponding, promote drainage, and minimize erosion. The side slopes of all above-grade disposal units shall be no greater than three feet horizontal to one foot vertical rise.
A requirement in the rule that the closed landfill have a maximum three-to-one slope in no way authorizes additional material to be added after closure in order for the required grade to be met. We reject the suggestion that a landfill that has lost its zoning and permit to operate may nevertheless continue to operate as a landfill under the guise of "grading." If Huff wanted to reach the required grades by adding material, it was his obligation to do so before his permit to dump expired. Even Dean Cannon, Huff's attorney, conceded at trial that once the County had denied extension of the conditional use permit, it would have been a violation for Huff to bring in material.
Huff's failure to have the landfill graded for closure was not the County's problem. He had at least two obvious options: he could either bring the landfill to the proper grade without adding to the landfill, or he could secure the County's permission to add to the landfill in order to bring it to grade. The County's response that the County would likely agree if he could secure DEP's approval was entirely proper.
It is also ironic that both the dissent and Huff in his claim letter argue that DEP did not object to the use of either C & D material or clean fill to meet the closure requirements. The dissent's observation that DEP "did not have a problem with [Huff] using clean fill to slope, grade and prepare the landfill for closing," implicitly acknowledges the rightness of the County's *67 position that DEP approval of whatever happened at that landfill was important. At trial, Huff's whole focus of liability was the claim that the County had placed him in an impossible "catch 22" situation by demanding consent from DEP that DEP could not give. Apart from the falsity of that premise, a claim such as this cannot be made unless the claimant can at least show that DEP's permission was sought and denied. Because, as a matter of law, the County did not prevent Huff from closing the landfill, there was no inverse condemnation.
REVERSED and REMANDED.
GRIFFIN, J., concurs.
SHARP, W., Senior Judge, concurs and concurs specially, with opinion.
PLEUS, C.J., dissents, with opinion.
SHARP, W., Senior Judge, concurring and concurring specially.
I concur with Judge Griffin's opinion reversing this case and respectfully disagree with Chief Judge Pleus' dissenting opinion. It is a basic rule of appellate law that a trial judge's conclusions of law come to us with the presumption of correctness. When the trial judge sat as the trier of fact, as in this case, we must accept his findings of fact unless there is no substantial competent evidence to support them. In my view, this case involves a mix of the two. I originally ruled that there was insufficient evidence to support a finding of taking on the part of the Department of Environmental Protection. I continue to adhere to this view. However, after reconsidering the established actions taken by Osceola County in the context of inaction on the part of Huff, I now agree with Judge Griffin, a taking for purposes of inverse condemnation was not proven against the County.[1]
All of the fact findings that support the trial judge's conclusion that a taking by the Department occurred when the County closed the landfill relate exclusively to the Department's denial of a general permit to operate the landfill in 1996.[2]
*68 Similarly, most of the fact findings of the trial judge, which support his conclusion that Osceola County effected a taking of the property when it closed the landfill, relate to the reasons for and the manner in which the County denied Huff a conditional zoning use to continue operating in 1997 and 1998.[3]
*69 Huff filed an administrative law action against the Department, challenging its denial of a general use permit in 1996, and was permitted to continue operating while pursing his administrative remedies. However, in 1999, Huff withdrew his petition for an administrative hearing of the Department's permit denial and filed a Notice of Acceptance of Agency Action. The Notice expressly stated that Huff accepted the propriety of the Department's denial of a permit and the County's denial of his application for a conditional use. Huff did not appeal, nor did he seek certiorari review in the courts as to the County's denial of his application for conditional zoning in 1997 and 1998, after the original conditional use had expired in 1996.
The starting point in this case is that Huff was operating a landfill without a permit from the Department to do so, and without appropriate zoning from the County. In denying the general use permit, the Department ruled that the landfill was a public nuisance. That was the law of the case. See Key Haven Assoc. Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153 (Fla.1982); Department of Environmental Protection v. Youel, 787 So.2d 923 (Fla. 5th DCA 2001); Vatalaro v. Department of Environmental Regulation, 601 So.2d *70 1223, 1227 n. 4 (Fla. 5th DCA), rev. denied, 613 So.2d 3 (Fla.1992).
Thus, the only relevant evidence as to whether a taking occurred for purposes of inverse condemnation, was what happened after those denials became effective. The Department did nothing. The County enforced its zoning ordinance by closing the landfill.
Huff's counsel effectively argued that at that point, the landfill had to be closed in order to have any reasonable use. He further argued that the County prevented Huff from closing the landfill when it refused to let him bring "clean fill"  crushed concrete and dirt  on the property in order to slope, grade, and cover the unclosed portions of the landfill, and when the County insisted that Huff first provide it with a closure plan approved by the Department. According to Huff, and as found by the trial court, that was an improper requirement on the part of the County, since under the Department's regulations, this kind of landfill did not require a Department approved closure plan in order to close.
This theory has some merit, I originally thought. Had any evidence below been presented to substantiate the fact that Huff had a bona fide intention to close the landfill and was barred or prevented by the County in that effort, there would have been a basis to support the trial judge's finding of a taking by the County. However, there is no evidence that he had such an intention or made such an effort. What he tried to do and tried to get the County to agree to let him do, was operate the landfill for the balance of its projected useful life as a landfill  five years, or even three years  in order to close parts as he went along and to generate sufficient funds to properly close it in compliance with the Department's regulations.
David Wright, Huff's engineer and consultant, quoted in the majority opinion, candidly testified Huff never had an intent to close the facility and accordingly Wright never notified the Department of such an intended course of action. Any closure plan he submitted to the County or Department was an "open to close" plan, requiring an extended operating term to reach capacity  five to two or three years.
Dean Cannon, Huff's attorney who was representing him at the relevant times, agreed that Huff's strategy was to operate the landfill for its remaining five years of useful life. In his correspondence with the County in which he requested permission for Huff to bring clean materials on site, he never used the word "closure" under Department rules. He also admitted that bringing in any materials onto the landfill, "clean" or not, would be a violation of the County's denial of the conditional use permit.
Q. And if the County had denied the conditional use application to use the landfill in an operation, then bringing on material to operate in the absence of a conditional use would be a violation of that denial; do you agree with me?
A. It would be inconsistent with the denial of the conditional use permit, yes.
Q. And a violation. You're a land use lawyer. Would you say it would be a violation?
A. Well, if the County's denial was appropriate, then yeah. If it wasn't, it wouldn't be.
Under these circumstances, I do not think that the County and the Department were required to grant Huff additional permits or conditional zoning, or to allow Huff to continue to operate the landfill in order to eventually close it. The County's enforcement of its zoning ordinance in this case thus could not constitute a taking, as a matter of law. See Lucas v. South Carolina *71 Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (harmful or noxious uses of property may be proscribed by government regulation without the requirement of compensation); Keshbro, Inc. v. City of Miami, 801 So.2d 864 (Fla.2001) (regulation eliminating the value of private property effects a taking unless the purpose of the regulation is to control a public nuisance);[4]State, Department of Environmental Protection v. Burgess, 667 So.2d 267 (Fla. 1st DCA 1995) (if landowner's proposed use of property constituted a nuisance, use was not part of landowner's property interests and compensation for denial of fill and dredge permit required for such use would not be due landowner on a theory of a constitutional taking).
PLEUS, C.J., dissenting.
I dissent. If there was ever a case for inverse condemnation, this one is it! After a thorough review of the record evidence, the original panel opinion concluded that there was competent, substantial evidence to support the trial court's conclusion that the County's actions in preventing closure of the landfill amounted to a compensable taking because it denied Mr. Huff all economic use of his land. The majority decision properly recognized that the determination of whether a taking has occurred sufficient to support an inverse condemnation judgment rests on a factual inquiry that must be made on a case by case basis. See Gardens Country Club, Inc. v. Palm Beach County, 712 So.2d 398, 402 (Fla. 4th DCA 1998). I concurred with Judge Sharp in that determination.
The County then filed a motion for rehearing, arguing that there was no evidence in the record to support the decision. In my view, a motion for rehearing is not appropriate to challenge a panel decision based solely on the conclusion that the record contains competent, substantial evidence to support the decision of the trier of fact. In Gainesville Coca-Cola v. Young, 632 So.2d 83 (Fla. 1st DCA 1994), the court rejected the argument that a panel decision finding competent, substantial evidence to support a final judgment was one of exceptional importance and noted the argument was "totally without merit."
A motion for rehearing must state with particularity the points of law or fact that, in the opinion of the movant, the court has overlooked or misapprehended in its decision. Fla. R.App. P. 9.330. The County's motion failed to state with particularity any point of law or fact that we overlooked or misapprehended in the original panel decision. Instead, the County simply pointed to Judge Griffin's dissent as support for its position. As Judge John Wigginton long ago noted in his widely-quoted opinion on the proper use of a motion for rehearing:
Certainly it is not the function of a petition for rehearing to furnish a medium through which counsel may advise the court that they disagree with its conclusion, to reargue matters already discussed in briefs and oral argument *72 and necessarily considered by the court, or to request the court to change its mind as to a matter which has already received the careful attention of the judges, or to further delay the termination of litigation.
State ex rel. Jaytex Realty Co. v. Green, 105 So.2d 817, 818-19 (Fla. 1st DCA 1958). This is precisely what the petition for rehearing does. It is nothing more than an effort to delay the termination of litigation. The original panel majority correctly determined that competent, substantial evidence supported the trial court's finding of a taking. In doing so, we thoroughly considered Judge Griffin's dissent, or so I thought.
Amazingly, Judge Sharp changed her mind and a new majority of the panel has decided to grant rehearing and decide just the opposite  that there was NO evidence of a taking! In doing so, the new majority has grossly exceeded the proper standard of review, substituting its view of the facts for that of the trial court. Beyond that egregious usurpation of authority, the new majority has also misconstrued the applicable administrative rules and has turned takings analysis on its head by shifting the proper focus from the County's actions to the landowner's intent. I will discuss each of these distressing developments in turn.

The Proper Standard of Review
A trial court's determination that government action has resulted in a taking is a factual one. Gardens Country Club, Inc. v. Palm Beach County, 712 So.2d 398, 402 (Fla. 4th DCA 1998). Thus, its determination of liability for inverse condemnation is presumed correct and should not be disturbed if supported by competent, substantial evidence. See, e.g., Dep't of Agric. & Consumer Servs. v. Polk, 568 So.2d 35, 40 (Fla.1990); Atlantic Int'l Inv. Corp. v. State, 478 So.2d 805, 808 (Fla.1985).
Furthermore, where the testimony is in conflict, the trial court, not the appellate court, must resolve all factual disputes. Keesee v. Keesee, 675 So.2d 655, 656 (Fla. 5th DCA 1996). On appeal, the appellate court must limit its review of the record for competent, substantial evidence, taking that evidence and any inferences arising from it in the light most favorable to sustaining the judgment, and disregarding any conflicting evidence counter to that position. See, e.g., Orme v. State, 677 So.2d 258, 262 (Fla.1996); Keitel v. Keitel, 724 So.2d 1255, 1257 (Fla. 4th DCA 1999).
In Shaw v. Shaw, 334 So.2d 13, 16 (Fla. 1976), the supreme court explained the application of this rule of law to a trial court's findings of fact in a nonjury trial as follows:
It is clear that the function of the trial court is to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses appearing in the cause. It is not the function of the appellate court to substitute its judgment for that of the trial court through re-evaluation of the testimony and evidence from the record on appeal before it. The test, as pointed out in Westerman [v. Shell's City, Inc., 265 So.2d 43 (Fla.1972)] is whether the judgment of the trial court is supported by competent evidence.... [I]t is not the prerogative of an appellate court, upon a de novo consideration of the record, to substitute its judgment for that of the trial court.
(Footnote omitted). This violation of a well-established rule of law is precisely what the new majority has done in this case by substituting its judgment for that of the trial court.

Competent, Substantial Evidence Supported the Trial Court's Finding That the County's Actions Amounted to A Taking
After a four day bench trial, the trial court properly concluded that the County's *73 actions in this case amounted to a compensable taking of Mr. Huff's property. It based that conclusion on the following findings of fact, all of which find ample support in the record:
13. In February 1997, the County locked the gates to the C & D facility and shutdown operations.
....
15. From February, 1997 through the present time, the County prohibited Plaintiffs from bringing in any type of fill, including clean fill, in order to properly grade, slope and prepare the site for proper closure under DEP rules. There was no legal authority for the County's prohibition against the Plaintiffs preparing the site for closure.
16. At all relevant times, the County prevented Plaintiffs from properly closing the landfill in accordance with DEP rules.
....
20. The County ... imposed standards and rules upon the Plaintiffs which were not set forth in any County code or ordinance, including the requirement that Plaintiffs provide the County with a "DEP approved closure plan" prior to undertaking activities to prepare the site for closure.
....
22. Osceola County's actions ... resulted in an ouster of Plaintiffs from their property.
23. Without proper closure of the C & D facility, the property has no economic beneficial use. In making this finding, the Court relies upon the testimony of the County Attorney, Jo Thacker, who admitted that Osceola County would not permit any use of the property until proper closure had been completed. The Court also accepts the testimony of David Wright and Doug Miller that the property has no reasonable use as it sits today or as it was left in February, 1997 when it was closed by the County.
In the original majority opinion, Judge Sharp thoroughly detailed the record evidence and concluded that it supported the trial court's findings that the County prohibited Mr. Huff from bringing in clean fill to grade, slope and prepare the landfill for closure, and by doing so, denied Mr. Huff all reasonable economic use of his land by barring him from closing the landfill. I concurred in Judge Sharp's application of the standard of review. The evidence in support of the trial court follows.
Dean Cannon, Mr. Huff's attorney, testified that after the County locked Mr. Huff out of his property in February 1997, Cannon made numerous attempts negotiating to get the County's approval to allow Mr. Huff to bring C & D material on site so that he could properly grade and slope the site and eventually cover it with two feet of dirt. Those actions were consistent with existing DEP rules for closure. However, the County would not agree. It required Mr. Huff to obtain DEP's written approval of a formal closure plan, which DEP does not and is not required to give.
Then, on December 31, 1997, Cannon sent the county manager a letter requesting the County's approval to allow Mr. Huff to bring only "dirt fill material and crushed concrete," not any other C & D material to the site. Mr. Huff would use this "clean fill" to "cover, grade and properly slope the facility." On January 28, 1998, almost one year after Mr. Huff's gate was padlocked, the county manager responded, making clear that unless Mr. Huff's proposal was made pursuant to a DEP "approved closure plan," the proposed activity was "prohibited." In other words, the County would not approve the *74 proposed action until Mr. Huff provided it with written evidence of DEP's approval.
In August 1998, Mr. Huff, through his attorney, again requested that the County allow him to use clean fill, consistent with DEP closure requirements, to properly grade and slope his property for closure. He stated:
As you know, neither the State of Florida nor Osceola County has any statutes, ordinances or rules that would prohibit Mr. Huff from accepting clean fill or inert material on the property. Nevertheless, last September, when Mr. Huff attempted to bring such material to the site in order grade and slope the property as part of the closure process, the Osceola Code Enforcement staff issued citations to both Mr. Huff and the truck drivers....
The conditional use permit that expired on February 17, 1997, specifically requires that the landfill be closed in accordance with the applicable rules of the Department of Environmental Protection. The use of clean fill is consistent with these rules, and is an allowed medium to achieve the proper sloping and grading necessary for closure. Mr. Huff intends, to commence filling his property with this material on or about September 1, 1998 and would request the County's support in this effort or the authority under which the County would prohibit such activity.
Once again, the County rejected this request, simply referring Mr. Huff back to its January 28, 1998 denial letter.
DEP representative William Bostwick, Jr., testified that DEP rules did not require Mr. Huff to submit a written closure plan, nor did they require that DEP pre-approve such a plan. DEP simply wanted him to close under the existing closure rules and demonstrate that it was properly closed when completed.
Significantly, Bostwick acknowledged that to properly close his facility, Mr. Huff would have to continue to bring materials onto the site. Cannon succinctly explained the necessity for this as follows:
Again, a landfill is sort of a large mound. If it's partially filled in, you shouldn't and can't leave a landfill like that. The county staff acknowledged that, and the people we spoke with at DEP acknowledged that. Something needed to be done to fill in the mound so that the slope was proper so then it could be covered with dirt and closed.
Bostwick testified that DEP would not have had a problem with Mr. Huff using clean fill material to slope, grade and prepare the landfill for closing. DEP did not regulate clean fill. Further, Mr. Huff had the authority to bring in clean fill material in 1997 and 1998 because the landfill was still permitted while he appealed the denial of his permit.
County attorney Jo Thacker conceded that the County did not have any regulations regarding the closure of landfills nor did they have any authority to enforce DEP rules. Despite this lack of authority, Thacker confirmed that the County refused to allow Mr. Huff to use clean fill material to close his landfill unless DEP first approved a closure plan in writing. Thacker also admitted that the County would not allow the property to be put to ANY use until the landfill was closed. As noted by the trial court, both David Wright and Doug Miller, two engineers retained by Mr. Huff, testified that the property had no reasonable use other than as a landfill until it could be properly closed.
In short, this evidence supported the court's findings that the County prevented Mr. Huff from closing the landfill. Mr. Huff's proposed use of clean fill material *75 (1) was necessary to properly close his landfill; (2) was entirely consistent with DEP's existing closure guidelines; and (3) would not have caused a nuisance because the clean fill did not include gypsum wallboard. Despite these facts, the County refused to allow Mr. Huff to close his facility and instead insisted that he provide the County with written approval from DEP. Because DEP did not pre-approve closure operations, much less in writing, Mr. Huff found himself in a classic Catch-22 situation. The County created this situation and in doing so, denied Mr. Huff any economic beneficial use of his property.
Despite the abundant evidence in the record supporting the trial court's findings, Judge Griffin and Judge Sharp purport to find no evidence of a taking. Even a locked gate and citations from code enforcement police will not convince them otherwise! Instead, they improperly conduct a de novo review of the record and "cherry picked" testimony favorable to their position. Instead of disregarding evidence that conflicted with the trial court's findings, they disregard the competent, substantial evidence that supported it. Sitting as super factfinders, they deem Mr. Huff's takings claim "entirely bogus" while finding conflicting evidence in the record credible enough to warrant a reversal of the result reached after a four day trial. Indeed, in her original opinion, Judge Griffin states, "All this tale is fiction." In so doing, the new majority has improperly substituted its judgment of the facts for that of the trial court, pure and simple.

The Majority's Misconstruction of the Applicable Closure Rules
In addition to ignoring competent, substantial evidence in the record, the majority's conclusions that there is "simply no evidence that the County kept Huff from closing the landfill in accordance with law," and that Huff "never attempted simply to close the landfill by following the closure procedure," rest upon an incomplete and therefore erroneous construction of the applicable law defining the closure procedure. Specifically, the majority holds, as a matter of law, that Huff "only had a duty to close  to place a final cover of a twenty-four inch thick soil layer, the upper six inches of which had to be capable of supporting vegetation, graded and compacted as necessary to eliminate ponding, promote drainage and minimize erosion."
The complete wording of the applicable closure rule follows:
Final cover and seeding or planting of vegetative cover shall be placed on each disposal unit within 180 days after it has reached its final grade. Final cover shall consist of a 24-inch-thick soil layer, the upper six inches of which shall be capable of supporting vegetation, and shall be graded and compacted as necessary to eliminate ponding, promote drainage, and minimize erosion. The side slopes of all above-grade disposal units shall be no greater than three feet horizontal to one foot vertical rise. If the disposal unit is lined, the closure design shall include a barrier layer or other measures to ensure that the design leachate head over the liner is not exceeded after closure.
Fla. Admin. Code R. 62-701.730(9)(b) (emphasis added). In other words, the majority overlooks the requirement that the landfill must be properly graded before covering it with soil. As noted in the previous section, DEP's own representative admitted that in the landfill's current state, Mr. Huff would have to continue to bring material onto the site and that DEP did not have a problem with him using clean fill to slope, grade and prepare the landfill for closing. Dean Cannon explained the necessity for continuing to *76 bring in clean fill prior to covering the landfill with soil:
Again, a landfill is sort of a large mound. If it's partially filled in, you shouldn't and can't leave a landfill like that. The county staff acknowledged that, and the people we spoke with at DEP acknowledged that. Something needed to be done to fill in the mound so that the slope was proper so then it could be covered with dirt and closed.
The trial judge clearly understood the DEP closure requirements and the evidence in the record which pertained to those arguments. He correctly found that the County "prohibited [Mr. Huff] from bringing in any type of fill, including clean fill, in order to properly grade, slope and prepare the site for proper closure under DEP rules" (emphasis added).
The majority attempts to obscure its own error by camouflaging the error in the middle of its "straw man" argument that Mr. Huff's position on appeal was that the County inversely condemned his land by preventing him from opening to close. Once again, the majority exceeds its proper scope of review. Mr. Huff was the appellee in this case. He raised many arguments in favor of affirming this appeal, including the "opening to close" argument. Indeed, the majority spends a great deal of space recounting the evidence supporting its conclusion that Mr. Huff's "scheme" was to continue to operate the landfill.
Unquestionably, continuing to operate the landfill was Mr. Huff's original objective. It was not a "scheme" at all but a legitimate plan openly expressed to the County during numerous good faith attempts to negotiate a reasonable solution. When it became clear that the County would not allow him to continue to operate, Mr. Huff simply tried to close his landfill according to the DEP closure procedure. DEP had no problem with Mr. Huff's proposed actions and even acknowledged their necessity. The County, however, could not be satisfied and prevented Mr. Huff from closing the facility. This evidence formed the basis of the trial court's finding of a taking. The majority's analysis and findings to the contrary are intentionally flawed to achieve its preferred result.

The Proper Takings Analysis
In addition to reweighing the evidence and misconstruing the applicable closure rules, the majority also creates its own takings analysis out of whole cloth. The majority states, "Mainly, what Mr. Huff wanted to do was to continue to operate the landfill...." Similarly, Judge Sharp states in her concurring opinion, "[h]ad any evidence below been presented to substantiate the fact that Huff had a bona fide intention to close the landfill and was prevented... in that effort, there would have been a basis to support the trial judge's finding of a taking by the County." Finding no such bona fide intention, Judge Sharp now believes that what Mr. Huff really intended to do was to continue to operate the landfill. It is inconceivable to me how that conclusion can square with her original opinion which states, "We conclude the evidence supports the trial court's finding that the county prohibited Huff from bringing in clean fill to grade, slope and prepare the site for closure...." See opinion, p. ____.
The problem with the majority and concurring opinions is that trying to divine the bona fides of the landowner's intent, at the appellate level no less, is not appropriate or required in a proper takings analysis. "In a typical inverse condemnation action, the landowner files an action alleging that it holds title to the property and that the county has committed acts that substantially interfere with the owner's property rights." 21 Fla. Jur.2d Eminent Domain *77 § 196 (2006) (emphasis added). A landowner must prove either a continuing physical invasion of the property or a deprivation of all or substantially all beneficial use of the property. Keshbro, Inc. v. City of Miami, 801 So.2d 864, 869 (Fla. 2001) (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Thus, the proper takings analysis focuses on the actions of the government and asks whether those actions have deprived the landowner of all or substantially all beneficial use of his property. It does not require a determination of what the landowner intends to do with his or her property, much less whether that intent is "bona fide."
Judge Sharp's concurrence further misconstructs the takings analysis by adding the assertion that the County's denial of Mr. Huff's request to bring in clean fill to close his landfill was justified on the ground of preventing a public nuisance. This assertion completely ignores the undisputed evidence that the proposed clean fill would not have caused a nuisance. The gypsum wallboard allegedly caused the noxious odors. That material was not part of the clean fill. One of the cases Judge Sharp cites in support of her assertion, Keshbro, Inc. v. City of Miami, 801 So.2d 864 (Fla.2001), makes clear that "injunctions issued to abate public nuisances must be specifically tailored to abate objectionable conduct, without unnecessarily infringing upon the conduct of a lawful enterprise." Id. at 876.
Although the County originally may have been acting to prohibit what it thought constituted a public nuisance, it is undisputed that when Mr. Huff shifted gears and repeatedly proposed to close his facility in an entirely lawful manner, the County refused to recognize this shift in position and proceeded to prohibit lawful conduct. When the County locked Mr. Huff's gate and then repeatedly prohibited him from bringing clean fill onto the property to close in accordance with DEP's regulations, they effectively condemned his property.

Liability under the Bert Harris Act
In a footnote, the new majority also rejects the trial court's alternative finding of liability under the Bert J. Harris, Jr. Private Property Rights Protection Act because Mr. Huff "clearly failed to submit the `bona-fide, valid appraisal supporting the claim' required by the Act." Section 70.001, Florida Statutes, does not define the terms "bona fide, valid appraisal." The majority concludes, without citation to any authority, that Mr. Huff's appraisal was not a "bona fide, valid appraisal" under the Act.
I disagree with this finding and would affirm the trial court's alternative finding of liability under this Act. The trial court correctly concluded, based on citation to prior precedent from this Court, that the appraisal was valid. It stated:
The Court also finds as a matter of law that the Plaintiffs complied with the provision of the Bert Harris Act, by timely providing DEP and the County with notice of its claim and by providing a valid appraisal to DEP and the County. In making such findings, the Court relies upon Florida Water Services v. City of New Smyrna Beach, 790 So.2d 501 (Fla. 5th DCA 2001), which acknowledges that an engineer may perform a valid appraisal and that the trial court has the discretion to accept such an appraisal as valid. Moreover, it is uncontested that another appraisal was performed by a real estate appraiser after the new suit was filed and pursuant to this Court's previous order. Therefore, any defects in the appraisal submitted with the Notice of Claim were effectively cured.
*78 In Florida Water Services, this Court held that the term "valid appraisal," found in section 74.031, Florida Statutes, was not required to be performed by a certified M.A.I. appraiser. Instead, this Court concluded that the validity of the appraisal turned on whether the person who prepared it was qualified to give an expert opinion, which was left to the trial court's discretion. Accordingly, this Court held that the trial court did not abuse its discretion in accepting an engineer's appraisal of a water and waste water system based on the engineer's experience with other water and waste water systems. Id. at 503-04.
Although this Court was interpreting a different statute in that case, its reasoning applied to the same terms used in section 70.001. Based on this authority, the trial court correctly concluded that Mr. Huff submitted a valid appraisal in this case. At the conclusion of the jury trial, Mr. Huff had to elect his remedy between the Bert Harris Act and inverse condemnation claims. He elected the latter and should not be barred from reasserting his claim under the Bert Harris Act.

Conclusion
I want to make it quite clear that this case is not about the denial of a conditional use. All of that discussion in the new majority opinion is a "red herring." The County had the authority to deny a conditional use permit. What it could not do is confiscate property in the manner done here without just compensation.
I have tried unsuccessfully to make my two colleagues understand why their decision is so fundamentally unfair and unjust. To those who have labored through reading the two opinions and my dissent, the unjust result must be obvious. The practical effect is that Mr. Huff can use his land for nothing. His private property effectively has been confiscated by Osceola County simply because the County denied him the opportunity to close the landfill. Were the decision of the trial judge affirmed, Osceola County would become the owner.
On today's real estate market, 1.4 million dollars does not seem to be an unreasonable price for a tract that size. The jury felt that way. With the tax revenues generated in a prosperous county like Osceola, the amount is a small percentage of its overall budget. With ownership, the County could devote the property to numerous public uses. For example, the property could be used as a firing practice range for law enforcement and the sheriff's department. It might make a good site for a sewer treatment plant or a refuse transfer station. The neighbors would have little basis to complain. When they moved into the area, the site was a landfill. Any number of public use options would be possible. In the alternative, the County could close the landfill and sell the land to a private party. Remember, the County holds the key to open the padlock on the gate at the entrance to Mr. Huff's property.
It has now been over ten years since the County locked Mr. Huff out and refused to let him close the landfill. I cannot help but note that justice delayed is justice denied. Resolving this baseless motion for rehearing alone has taken over a year. This in itself is inexcusable and warrants an apology to the parties.
Accordingly, I would deny the motion for rehearing and reinstate the original panel decision. So much for private property rights.
NOTES
[1] A construction and demolition debris facility may accept material, such as steel, glass, brick, concrete, asphalt, pipe, gypsum wallboard and lumber, from the construction or destruction of a structure.
[2] A conditional use is a use identified in the zoning regulations which may be approved subject to filing the appropriate applications and site plans.
[3] The Bert Harris Act, found in section 70.001, Florida Statutes (1997), creates a separate and distinct cause of action for property owners where governmental regulation has "inordinately burdened" the property, but does not amount to a "taking" under the Florida or federal constitutions.
[4] Key Haven Assoc. Enters., Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153 (Fla.1982); Department of Environmental Protection v. Youel, 787 So.2d 923 (Fla. 5th DCA 2001); Vatalaro v. Department of Environmental Regulation, 601 So.2d 1223, 1227 n. 4 (Fla. 5th DCA), review denied, 613 So.2d 3 (Fla.1992).
[5] In light of the complete reversal of the inverse condemnation judgment, we have also considered the trial court's alternative finding of liability under the "Bert Harris Act," § 70.001 et seq., Fla. Stat. (1998). However, Huff clearly failed to submit the "bona-fide, valid appraisal supporting the claim" required by the Act. Failure to satisfy this requirement cannot be cured by filing an appraisal in the litigation. Nor does the Act apply to the impact on real property occasioned by governmental abatement, prohibition, prevention or remediation of a public nuisance at common law or a noxious use of private property, which, as explained above, the actions complained of indisputably were.
[6] Florida's constitution states that no private property shall be taken except for a public purpose and with full compensation paid to each owner. Art. X, § 6a, Fla. Const.
[7] Notably, for the first several months after the conditional use to operate the landfill had expired, while Huff was attempting to place construction and demolition debris that he had "purchased" from his wife's company, Gemini, Huff took the position that under the DEP permit, construction and demolition debris was the only material DEP would allow him to place on the landfill.
[1] A judge's change of mind in the context of rehearing is not rare, nor to be condemned as unexpected or unfounded. See Gardiner v. Goertner, 110 Fla. 377, 149 So. 186 (1933).
[2] The Court's Findings of Fact:

5. The Court accepts the testimony, by deposition, of Wiliam Bostwick that there were no alleged violations which were so serious as to make DEP close the facility. The Court also accepts the testimony of David Wright that any issues relating to the operation of the landfill were satisfactorily resolved with the DEP and with Osceola County, or were being resolved based on a mutually agreed upon course of action.
6. In December 1995, the DEP adopted a new rule through both oral communications and written correspondence from Dan Morrical to Mr. Huff which required Mr. Huff to `reduce odor levels at this facility to a level that eliminates odor complaints.' Prior to that time, the DEP's promulgated rules and regulations only required the operator of the C & D facility to `minimize odors.' Moreover the formally promulgated rules of the DEP did not require any offsite odor remediation for C & D facilities, as it did for Class I, II and III landfills. DEP, through its authorized representative, also adopted an unwritten standard that the level of hydrogen sulfide emissions must be reduced to less than .001 ppm (parts per million).
* * *
9. After the timely application was submitted to DEP, DEP formally changed its rules to require C & D facilities to obtain a specific permit for operation of a C & D facility and also imposed new rules requiring a C & D facility operator to provide financial assurances and long term monitoring of the facility after the facility was closed. Prior to these new, formal rules, C & D facilities were to be closed in accordance with DEP rules, which only required a final cover of 2 feet of dirt. The DEP did not require an approved closure plan as it did for Class I, II and III landfills, but rather, only required the C & D facility to inform the DEP after closure had been completed. Had DEP acted upon Plaintiff's application in a timely manner, Plaintiffs would have had approximately two years to bring its facility into compliance with the new rules. DEP admitted that the general use application met DEP standards for issuance as they existed at the time the application was made.
10. In October, 1996, the County and DEP representatives met to discuss the Plaintiffs' C & D facility. The purpose of the meeting was to set forth the new rules and regulations which would be applied to the C & D facility going forward. No representative of the Plaintiffs' was present at this meeting.
11. After the October, 1996 meeting, DEP issued a Notice of Denial of the General Use Permit which stated two reasons for denial of the General Use Permit: the past conduct of the applicant and the applicant's inability to eliminate odor complaints. In September 1997, DEP informed Plaintiffs that any further consideration of a permit for Plaintiffs' facility would be pursuant to the newly promulgated rules.
* * *
14. Prior to DEP's issuance of the denial of the General Use Permit and Osceola County's denial of the Conditional Use Application, the Plaintiffs expended considerable sums of money in reliance upon the continuing operation of the landfill, including installation of a sophisticated odor abatement system.
* * *
17. In denying the General Use Permit, the DEP weighed the interests of the Indian Ridge Homeowners against the interests of the Plaintiffs and concluded that the interests of the Indian Ridge Homeowners outweighed the interests of the Plaintiffs.
* * *
19. The DEP imposed an impossible standard on Plaintiffs' C & D facility by requiring it to `eliminate odor complaints' and by requiring it to reduce hydrogen sulfide levels to under .001 ppm. One of the permitted substances to be disposed of at a C & D facility is gypsum wallboard which is known to emit hydrogen sulfide. Therefore, the C & D facility could accept perfectly legal materials and still be in violation of DEP's rules because the legal substances emit hydrogen sulfide. Moreover, by imposing a standard which required Plaintiffs to eliminate any odor complaints (some of which were admittedly unfounded), the DEP, in effect, eliminated Plaintiffs' ability to operate a C & D facility.
* * *
21. The DEP, by applying the new rules and regulations to this C & D facility, has made it impossible for the facility to 1) reopen under current DEP standards; or 2) close the facility.
The trial judge made the following Legal Conclusions regarding DEP:
2. As to the DEP, the Court finds that the DEP imposed a new rule of regulation upon the Plaintiffs, specifically that DEP required Plaintiffs to eliminate all odor complaints and to reduce hydrogen sulfide emissions to less than .001 ppm. As a result of DEP's application of these new rules or regulations, the Court finds that the DEP's application of this new rule or regulation has inordinately burdened the Plaintiffs' property.
3. Plaintiffs had a vested right to use the property as a C & D facility based on the County's and DEP's original permits which recognized a useful life of approximately ten years, as well as the fact that the property had been a landfill since 1996. In addition, the Plaintiffs expended considerable sums to install an odor abatement system at the request of DEP and the County just prior to being shutdown.
4. As a result of the County and DEP actions, the Plaintiffs were denied all reasonable, economic use of the property.
5. As a result of the foregoing, the Court finds that the County and DEP inversely condemned the Plaintiffs' property.
[3] In addition to the above footnote, the Court made Fact Findings regarding the County:

12. In February, 1997, the County denied Huff's application for conditional use renewal.
13. In February, 1997, the County locked the gates to the C & D facility and shutdown operations.
* * *
15. From February, 1997 through the present time, the County prohibited Plaintiffs from bringing in any type of fill, including clean fill, in order to properly grade, slope and prepare the site for proper closure under DEP rules. There was no legal authority for the County's prohibition against Plaintiffs preparing the site for closure.
16. At all relevant times, the County prevented Plaintiffs from properly closing the landfill in accordance with DEP rules.
* * *
18. In denying the Conditional Use, the County weighed the interests of the Indian Ridge Homeowners against the interests of the Plaintiffs, and concluded that the interests of the Indian Ridge Homeowners outweighed the interests of the Plaintiffs.
* * *
20. The County, acting in concert with DEP, imposed standards and rules upon the Plaintiffs which were not set forth in any County code or ordinance, including the requirement that Plaintiffs provide the County with a "DEP approved closure plan" prior to undertaking activities to prepare the site for closure.
* * *
22. Osceola County's actions, along with the actions of DEP resulted in an ouster of Plaintiffs from their property.
23. Without proper closure of the C & D facility, the property has no economic, beneficial use....
* * *
25. The Court finds that there was no evidence to support DEP's and Osceola County's contention that the C & D facility constituted a public nuisance. The court rejects the County and DEP's arguments on this issue as being unsupported by competent substantial evidence.
The court also made the following Conclusions of Law regarding the County.
1. The County, through its actions, entered onto the Plaintiffs' property for more than a momentary period and devoted such property to a public use. Osceola County did so by physically locking the gates to the landfill, prohibiting trucks and equipment from entering onto the property and prohibiting Plaintiffs from performing the activities necessary to close the landfill. The County's actions were done in concert and with the assistance of DEP. The County also substantially interfered with Plaintiffs' property right by applying unwritten, unpromulgated, ad hoc rules and regulations to this facility. The County's application of these rules have inordinately burdened Plaintiffs' property.
[4] I agree with Judge Pleus that injunctions issued to abate public nuisances must be specifically tailored to abate the objectionable conduct, without unnecessarily infringing upon the conduct of a lawful enterprise. Keshbro, 801 So.2d at 876. I also agree with Judge Pleus that prohibiting a landowner from closing its facility may result in a compensable taking. However, I disagree with Judge Pleus that the evidence in this case makes a prima facie showing that the landowner was attempting to close the facility. It shows, without dispute, that Huff never intended to simply close the landfill. He wanted to continue operating it as a landfill and then close it. Since he did not have the required permit, operating the landfill in any manner was no longer lawful.